[Cite as *In re K.B.*, 2014-Ohio-3654.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY

|                    |   |                                  |
|--------------------|---|----------------------------------|
| IN RE:             | : |                                  |
|                    |   | CASE NOS. CA2014-02-042          |
| K.B., et al.       | : |         CA2014-02-043            |
|                    |   |         CA2014-02-044            |
|                    | : |                                  |
|                    |   | O P I N I O N                    |
|                    | : | 8/20/2014                        |
|                    |   |                                  |
|                    | : |                                  |

APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case No. JN2010-0118

Scott N. Blauvelt, 246 High Street, Hamilton, Ohio 45011, for appellant

Michael T. Gmoser, Butler County Prosecuting Attorney, Government Services Center, 315 High Street, 11th Floor, Hamilton, Ohio 45011, for appellee, Butler County Children Services

Thomas Hodges, 708 Walnut Street, Suite 600, Cincinnati, Ohio 45202, for K.G.

Dawn Garrett, 9453 Waterstone Boulevard, Cincinnati, Ohio 45249, for M.W.

John Ford, Legal Aid Society of Southwest Ohio, LLC, 10 Journal Square, Third Floor, Hamilton, Ohio 45011, Guardian Ad Litem for K.B.

Amy Ashcraft, 240 East State Street, Trenton, Ohio 45067, Guardian Ad Litem for K.K. and Z.B.


**M. POWELL, J.**

{¶ 1} Appellant, the biological mother of three children, appeals a decision of the

Butler County Juvenile Court granting legal custody of one child to his father, legal custody of

another child to his grandmother, and permanent custody of the third child to a children services agency.

{¶ 2} Butler County Department of Job and Family Services filed a complaint on March 30, 2010 alleging that appellant's three children were neglected and dependent. At the time, appellant's two sons, Z.B. and K.B., were six and eleven years old respectively, and her daughter, K.K., was two years old. The agency was granted temporary custody and the children were placed in a foster home.

{¶ 3} The complaint was filed after the agency received a report that K.K. was hospitalized at Shriner's Hospital with severe burns after pulling a pot off the stove. The report stated that appellant was belligerent and threatening toward hospital staff, telling a social worker that she would be killed the next day. The report also indicated that appellant threatened to take the child out of the hospital against medical advice and that the child's condition was deteriorating and she would most likely need surgery. The report further stated that appellant was taken to University Hospital for a psychological evaluation due to her behavior.

{¶ 4} According to the complaint, when appellant returned from University Hospital, she was asked to sign a contract agreeing that she would not be aggressive towards Shriner's hospital staff or security. Appellant refused to sign the document. Appellant's behavior escalated and she was arrested for menacing and disorderly conduct. The complaint also alleged that appellant had an extensive history of criminal charges dating from 2004 to present. This history included four menacing charges, two charges for disorderly conduct, one assault charge, and one charge of domestic violence.

{¶ 5} The complaint further alleged that appellant had previous involvement with Children Services and a history of belligerent, uncooperative, combative and threatening

attitude toward agency staff. The complaint stated that the agency had received reports in 2009 that appellant was homeless and had threatened to drown herself and her children. The complaint indicated that appellant has a history of bipolar disorder and was not compliant with treatment or medications.

{¶ 6} The children were adjudicated neglected and dependent and temporary custody with the agency was continued. A case plan was prepared with reunification as the goal. Over the next year, appellant made some measure of progress. Visitation progressed from being supervised at the agency to unsupervised overnight and weekend visits. At a review hearing in late May 2011, K.K. was placed in the temporary custody of her mother, with the boys returning to their mother's custody at the end of the school year in early June. The court indicated it would consider returning legal custody to the mother at the August review hearing if things continued to progress.

{¶ 7} At the August 2011 review hearing, some concern was expressed that appellant was homeless and living with her sister after being evicted for failing to pay rent, although appellant was to move into a new home soon. Concern was also expressed that during the summer, the children were living with or staying with other people for long periods of time, such as K.B. living in Alabama with his father and K.B. staying for weeks with his paternal grandmother. The court further expressed concern because appellant had prematurely stopped going to counseling, the children were no longer in therapy, and appellant had been arrested after a domestic violence incident with her brother.

{¶ 8} In early December 2011, appellant was charged with domestic violence for an incident involving K.K., who had a large bump on her head. Consequently, the children were placed back in the temporary custody of the agency and placed in foster homes. In February 2012, Z.B. was placed in the home of his paternal grandmother. On April 13, 2012, the

agency filed a motion requesting permanent custody of K.B. and K.K. and requesting that legal custody of Z.B. be granted to his paternal grandmother.

{¶ 9}   A hearing on the motions began on October 17, 2012 and continued over several dates, finally concluding on March 6, 2013.  The magistrate issued decisions on August 2, 2013, placing Z.B. in the legal custody of his paternal grandmother, placing K.B. in the legal custody of his father, and granting permanent custody of K.K. to the agency.  After a hearing, the trial court overruled objections to the magistrate's decision.

{¶ 10}  Appellant now appeals the trial court's decisions regarding custody of her three children.  She raises the following four assignments of error for our review:

{¶ 11} THE TRIAL COURT'S DECISION AND ORDER GRANTING PERMANNET CUSTODY OF K.K. TO THE BUTLER COUNTY DEPARTMENT OF JOB AND FAMILY SERVICES WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 12} THE TRIAL COURT'S DECISION AND ORDER GRANTING LEGAL CUSTODY OF K.B. TO FATHER WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 13} THE TRIAL COURT'S DECISION AND ORDER GRANTING LEGAL CUSTODY OF Z.B. TO PATERNAL GRANDMOTHER WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 14} THE TRIAL COURT ABUSED ITS DISCRETION AND ERRED TO THE PREJUDICE OF MOTHER IN ALLOWING THE ADMISSION OF HEARSAY EVIDENCE.

Permanent Custody Hearing

{¶ 15} At the permanent custody hearing, agency caseworker Tara Eve testified that she had previously worked with the family in a voluntary case in 2008.  She was the caseworker on the current case when it began in April 2010 until September 2011.  Eve

- 4 -

indicated that she was concerned with the family being in an environment where appellant could not control her anger and frustration. The goal was for appellant to learn coping skills to control her anger through counseling and therapeutic services and to not present her anger and frustration in front of the children.

{¶ 16} The caseworker testified that although parents can become angry and upset at agency workers when their children are removed, appellant's behavior escalated to a point where there was considerable derogatory profanity and the caseworker felt threatened. The caseworker testified that appellant did not understand why her children were removed and the caseworker tried to explain to appellant that her threatening behavior at the hospital and appellant's instability were the reason for the removal. The caseworker testified that after a therapeutic session to discuss the case and throughout her continued involvement with appellant, things between them improved.

{¶ 17} The caseworker indicated the agency received several requests to perform home studies for possible family members as alternative placements for the children, but none of these studies were completed due to the relatives withdrawing from the process. She indicated there was some delay in getting the children into counseling, but they started attending prior to reunification with appellant.

{¶ 18} The caseworker testified that appellant has a history of instability regarding housing and there were inconsistent stories regarding how K.K. was burned. She discussed the case plan requirements and stated that although appellant did an adult diagnostic assessment of function with Dr. Onady, appellant refused to do a psychological evaluation and that a parenting class was not part of the case plan because appellant was previously unsuccessful in the Development of Living Skills program. She indicated visits initially went poorly because appellant was focused on the caseworker and had discussions in front of the

children, but the visits improved over time. She testified that although there were still concerns, she was in favor of reunification in May 2011.

{¶ 19} During the period of reunification, the caseworker met with the family frequently. She indicated that during the summer of 2011, appellant lost her housing due to eviction and was living with her sister. She also testified that during the course of the case, appellant was incarcerated several times, including an arrest for a domestic violence incident with her brother.

{¶ 20} Carla Day testified that she was the caseworker from August 2011 forward. She indicated that at the time she received the case, the children were in the temporary custody of appellant, although none of the children were physically living with appellant. The concerns at the time included housing and the need for the family to follow through with mental health treatment. The caseworker stated that appellant quit therapy for a while because she was overwhelmed. In addition, K.K. had been excluded from the therapeutic preschool program she was enrolled in because appellant failed to follow through with the paperwork and requirements. The caseworker testified that the children were removed from the home by the Middletown Police in December 2011 because of a concern that K.K. had been abused by appellant.

{¶ 21} The relationship between the second caseworker and appellant deteriorated and in January 2012, appellant said she no longer trusted the caseworker and did not want to meet with her unless her attorney was present. The caseworker testified that she observed appellant having difficulty getting along with several members of the agency and displaying angry, aggressive, rude and demeaning behavior. She described an incident in which she was transporting appellant and when appellant got angry, she threw a glass bottle at her nephew in the car. After the children were removed the second time, family therapy was

recommended. Appellant started family therapy, but recommendations were made that appellant not attend until her own mental health stability would allow her to do so.

{¶ 22} Day stated that the agency filed the motions for permanent and legal custody because of the amount of time the children had spent in foster care and because there were no further case plan services the agency could offer appellant that would increase the likelihood of safety for the children. The caseworker indicated she had no concerns regarding Z.B.'s placement with his paternal grandmother. She stated that in her limited contacts with K.B.'s father, he presented as a responsible parent and she would likely support placement with him if the Alabama home study were approved. The caseworker further indicated that for K.K. there were no possible alternative placements.

{¶ 23} The caseworker stated that her current concerns regarding reunification now were the instability of housing and that appellant's behavior and aggression had not subsided in any way that would indicate the children would be safe over an extended period of time. There was also concern that appellant had multiple arrests, had failed to follow through with the case plan when she had the children, and current visits with the children were not going well. The caseworker testified that appellant was now involved in counseling, but indicated that the counselor's focus was on appellant, while the agency's focus was on safe parenting for the children.

{¶ 24} Rhonda Sneed, an agency worker who supervised visitations when the children were first removed testified that visits were "up and down" and depended on appellant's mood, but she was usually able to settle appellant down and visits were productive. She indicated appellant's interaction with the first caseworker was "rocky" but got better and appellant's interaction with staff depended on her mood.

{¶ 25} Robin Hostetler, a therapist who began conducting in family therapy in February

2012, after the children were removed the second time, testified that her goal was to work towards reunification and help the family with relationships and communication. She said she met with the family for one hour a week and then supervised visitation for an hour. She testified that at the beginning, she thought she had a pretty good relationship with appellant, but appellant became more volatile and combative and their relationship went downhill as time passed. The therapist testified that although she gave feedback when appellant was doing things well, problems arose any time she made suggestions regarding parenting skills or concerns over how the children were behaving. She indicated appellant would respond with silence, or an attitude with rolling her eyes, and that appellant often had abrasive responses to the emotions of the children.

{¶ 26} Hostetler testified progress was inconsistent. She indicated appellant's moods are flexible and not stable at all, and the children are guarded in their interactions with appellant. Her concerns involved appellant's instability and the therapist explained that while the children love their mother, they are confused and fearful of her behavior. She stated that visits where appellant's attorney and GAL attended went "uncharacteristically well" and appellant was not as aggressive, and had more careful, guarded behaviors.

{¶ 27} The therapist indicated that appellant's behavior led to her recommendation that appellant stop attending the family therapy because the therapist's relationship with appellant was becoming more harmful to the children. She indicated because of the issues involved, she felt a new therapist would be beneficial for the family.

{¶ 28} The second family therapist, Mary Oenbrink, also testified and explained that she performs family therapy with the children and supervises visits. She indicated that the therapeutic visits were needed because visits were unpredictable and appellant needed to be supervised and given feedback on her interactions with the children. She stated that she

initially would give appellant feedback on visits prior to her visitation time, but appellant would become frustrated before the visit and have difficulty with the children. She stated that she now gives the information to appellant's therapist so she can process it and there is less likelihood appellant will become angry and frustrated before the visit. She indicated she has seen appellant verbally aggressive with the children and the children do not feel safe being able to express themselves to appellant. She indicated when she began family therapy the children were resistant and were concerned that what they said would get back to appellant.

{¶ 29} Oenbrink indicated that her biggest concern with the visits was appellant's unpredictability and that appellant becomes angry about minor things like they were major incidents. She also expressed concern regarding some of appellant's conversations with K.K. and stated that appellant "stresses the children out" when visits are volatile. She explained that appellant will get angry and then "cold" in her reactions with the children.

{¶ 30} Kristin Hoffman, a licensed social worker who is the program director at the visitation center where visitations took place after the second removal, testified that she covered one of the family's visits personally, observed other visits and has been asked to intervene in visits. She described a conflict with the case manager in February 2012 in which a deputy was involved and she tried to deescalate the situation.

{¶ 31} Hoffman indicated a new therapist was assigned because of consistent complaints from appellant. She testified she has seen "physical advancement" from appellant towards the caseworker, but no contact. She indicated that appellant has made some progress, but still struggles significantly with control of her emotions. Hoffman explained that appellant is not currently in family therapy because she has not reached the point of emotional stability needed to reengage in family therapy.

{¶ 32} Dr. Alice Onady, a psychiatrist at Community Behavioral Health, testified that

she began seeing appellant in October 2010. Appellant was initially seeing another psychiatrist at the office, but because of a disagreement, Dr. Onady agreed to see appellant. Appellant was diagnosed as bi-polar with a paranoid personality disorder. Dr. Onady indicated this diagnosis includes mood swings, angry outbursts, conflicts with others, depression, agitation and poor coping skills. Dr. Onady indicated appellant meets with an individual therapist and then met with appellant every two to three months for medication management.

{¶ 33} Dr. Onady indicated that on more than one occasion, appellant had problems and conflicts with the office staff. Dr. Onady testified that she discharged appellant from treatment because of several situations in which appellant was inappropriate with her staff. When the psychiatrist attempted to discuss appellant's behavior with her on the day of an incident, and told appellant she could not work with her if she were disruptive, appellant said she did not want to continue treatment. She indicated that while she deals with patients who have mental health problems, it is not common to terminate patients in this manner.

{¶ 34} Dr. Onady testified appellant made progress during treatment, and overall there was some improvement, but it was not consistent. She indicated some concern with appellant's ability to parent as the psychiatrist indicated appellant needs to be able to control her anger.

{¶ 35} Corinne Pearson, a therapist at Access Counseling, indicated that she first met with appellant in August 2010 and prepared a treatment plan that focuses on the negative consequences of anger. Pearson has been working with appellant to facilitate impulse control thought modeling and increasing sensitivity to consequences. Pearson indicated that appellant struggled through 2011 with minimal progress, but has made dramatic progress since May 2012. The therapist stated that appellant still has "much to do." When

questioned, she indicated that it was difficult to estimate, but reunification may be possible in six months with supports in place.

{¶ 36} Deanna Proctor, the CEO of Access Counseling, testified that she has not had any problems with appellant and has seen growth over the past year. She indicated appellant now processes things before reacting. Debra Cotter, the clinical director at Access, also indicated that she first met appellant in 2010 when she assigned Pearson as appellant's therapist and that she has seen improvement in appellant. She indicated appellant does a better job at managing her emotional behavior.

{¶ 37} Theresa Paul, a mental health therapist, testified that she was approached by Corrine Pierson, appellant's therapist, to provide supplemental material on anger management. She testified that she presented tools and skills to appellant to use and worked with appellant to examine her thoughts, feelings and behaviors and how they are connected. Paul indicated that appellant was receptive and understood the material. She indicated that appellant has the tools to manage her anger, but cannot predict how appellant will implement them.

{¶ 38} Donna Vondrell, the case manager for K.K.'s preschool, testified that she met with appellant about seven months prior to her testimony, and again about a month prior. In the first meeting, she indicated appellant became irate with people and felt that they were not "on her side." The case manager indicated she saw a great difference in how appellant handled herself at the second meeting and was able to "hold her tongue." She indicated that during the second meeting, she could tell appellant wanted to say something, but knew it was not in her best interest.

{¶ 39} Nancy Baker, the director of K.K.'s preschool, testified that she is responsible for the operation of the program and the staff. She explained that the therapeutic preschool

addresses both academic studies and social-emotional skills. The preschool is working with K.K. on individual therapy to address her anger and aggressing issues and to develop effective coping skills. She indicated that K.K. was excluded from the program for a few weeks at the end of November 2011 because she was missing a physical examination and shot record which appellant failed to submit. When K.K. was placed back into foster care, her caregiver submitted the documentation and K.K. resumed preschool.

{¶ 40} Baker also testified that she scored assessments taken by K.K. and appellant in order to determine therapy needs. K.K. scored in the clinical range on the anger and aggression scale and on the disassociation scale. Appellant scored on the high-risk indexes in the areas of expectations of children scale, parental empathy towards children's needs scale and use of corporal punishment scale.

{¶ 41} Jennifer Minnick, a professional clinical counselor at K.K.'s therapeutic preschool program, indicated that she has been working with the child to improve and increase self-expression, specifically anger-related behavior. She indicated that K.K. has anger issues and does not have good coping skills. The child responds by screaming, crying, hitting, kicking and punching when she does not get her way or is disappointed.

{¶ 42} Minnick indicated she is working with the child to develop safer, more effective ways to process her feelings. The counselor indicated that K.K.'s behavior changes negatively around visits. The child expresses that she wants visits to go well , but she is worried about what is going to happen. The child worries about whether something the children say in the visit will make appellant angry. The counselor indicated that K.K. requires significant understanding and patience, along with a good routine and schedule. She indicated being with a caregiver who responds with volatile behavior would exacerbate the situation.

{¶ 43} Middletown Police Officer Gary Bender testified that on December 18, 2012, he received a disturbance call at one o'clock in the morning. The police officer found appellant involved in a verbal argument with another person and arrested appellant on a bench warrant.

{¶ 44} Appellant testified that she works two part-time jobs and is trying to receive Social Security disability benefits because of her mental health problems. She stated that she doesn't trust anyone at Children's Services and that the people who are saying her children are stressed are lying because they do not want appellant to have her children. She stated that if her children are upset at visits, it is because they want to come home. She denied that her paranoia has anything to do with how she views Children's Services.

{¶ 45} Several witnesses testified on behalf of appellant, including her sister, other family members and acquaintances. The witnesses indicated appellant is a good mother, loves her children and they have not seen her physically touch the children. Some of the witnesses indicated appellant is not angry unless she is pushed or provoked.

{¶ 46} The foster parent for K.K. testified that he had all three children in his home after the first removal and maintained a relationship with the children after they were reunited with their mother. He indicated that when he initially took the children home on reunification, appellant did not appear prepared to parent them. He took food and groceries to appellant's house and helped with the children a few times while encouraging and supporting appellant. After the children were removed the second time, they went to another foster home for a time, then K.K. and K.B. were placed back in his home, although only K.B. is currently in his home. He indicated that K.B. "shuts down" after visits with his mother and takes a day or two to bounce back.

{¶ 47} Z.B.'s paternal grandmother testified that she has been his custodian since

January 2012 and that he stayed with her most of the summer of 2011. She indicated that Z.B. becomes upset after visits and it takes days to reassure him. She stated that she is willing to raise Z.B. until he is 18. She indicated that she would supervise visits with his mother and/or father and would follow all court orders if the child were in her legal custody.

{¶ 48} K.B.'s father testified at the hearing that he graduated from high school and attended one and one-half years of college. He stated that he first met K.B. in 2011 when the child came to stay with him in Alabama for the summer. He testified that he has been working full time since December 2010 and that his wife works as a surgical technician at a hospital. He testified that he has criminal convictions for possession of drugs in 2004 and was in federal prison for possession of a firearm until October 2010. K.B.'s father testified that he coaches football, basketball and baseball in the small town where he lives. He testified that he would be willing to take legal custody of K.B. and provided a letter signed by several community members expressing support for him.

Permanent Custody of K.K.

{¶ 49} Before a natural parent's constitutionally protected liberty interest in the care and custody of her child may be terminated, the state is required to prove by clear and convincing evidence that the statutory standards for permanent custody have been met. *Santosky v. Kramer*, 455 U.S. 745, 759, 102 S.Ct. 1388 (1982). An appellate court's review of a juvenile court's decision granting permanent custody is limited to whether sufficient credible evidence exists to support the juvenile court's determination. *In re Starkey*, 150 Ohio App.3d 612, 2002-Ohio-6892, ¶ 16 (7th Dist.). A reviewing court will reverse a finding by the juvenile court that the evidence was clear and convincing only if there is a sufficient conflict in the evidence presented. *In re Rodgers* (2000), 138 Ohio App.3d 510, 520 (12th Dist.).

**{¶ 50}** Pursuant to R.C. 2151.414(B)(1), a court may terminate parental rights and award permanent custody to a children services agency if it makes findings pursuant to a two-part test. First, the court must find that the grant of permanent custody to the agency is in the best interest of the child, utilizing, in part, the factors of R.C. 2151.414(D). Second, the court must find that any of the following apply: the child is abandoned; the child is orphaned; the child has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period; or where the preceding three factors do not apply, the child cannot be placed with either parent within a reasonable time or should not be placed with either parent. R.C. 2151.414(B)(1)(a), (b), (c) and (d); *In re E.B.*, 12th Dist. Warren Nos. CA2009-10-139, CA2009-11-146, 2010-Ohio-1122, ¶ 22.

**{¶ 51}** The juvenile court found by clear and convincing evidence, and appellant does not dispute, that K.K. has been in the temporary custody of the agency for more than 12 months of a consecutive 22-month period as of the date the agency filed the permanent custody motion. However, appellant does dispute the juvenile court's finding that granting permanent custody of the children to the agency is in the child's best interest.

**{¶ 52}** R.C. 2151.414(D)(1) provides that in considering the best interest of a child in a permanent custody hearing:

> [T]he court shall consider all relevant factors, including, but not limited to the following:
>
> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children

- 15 -

services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period * * *;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

{¶ 53} With respect to R.C. 2151.414 (D)(1)(a), the juvenile court found that K.K. and appellant love each other and have a bond and that K.K. enjoys seeing appellant and her brothers at visitations. The court also found that the guardian ad litem reported that K.K. has behavioral issues in the days surrounding visits and this behavior was confirmed by K.K.'s therapist. The court also noted there was testimony that while K.K. is excited about visits, she also worries because sometimes her statements anger appellant and K.K. has expressed fear toward her. The court also indicated that during the period appellant was participating in family therapy with the children, the therapists testified that K.K. did not want to share her feelings based on appellant's intimidating demeanor in the sessions.

{¶ 54} The court also found that K.K. has been placed in several foster homes during the case, and in September 2012 moved to her current foster home where she has remained. The court found that the guardian ad litem reported K.K. is very comfortable in the home and with her foster mother. The court also found that there was no evidence K.K. has ever had contact with her father. During the case, three men were listed as K.K.'s father and eventually her biological father was identified through DNA testing. K.K.'s father failed to appear at any of the hearings or to contact the agency about his daughter.

{¶ 55} With respect to R.C. 2151.414(D)(1)(b), the juvenile court indicated that no in camera interview with K.K. was requested or performed. The court found there was evidence that K.K. has stated that she would like to live with appellant. The court also found that K.K.'s

guardian ad litem recommended that K.K. be placed in the permanent custody of the agency.

{¶ 56} With respect to R.C. 2151.414(D)(1)(c), the juvenile court found that K.K. has been in the temporary custody of the agency for more than 12 of 22 months. The court indicated that as of the date of the last hearing on March 6, 2013, K.K. had been residing in foster care for approximately 30 months.

{¶ 57} With respect to R.C. 2151.414 (D)(1)(d), the juvenile court found that it is clear that K.K. is in need of a legally secure placement as she has resided in foster care for approximately 30 months during the case. The court further found that the agency presented clear and convincing evidence that appellant is not in a position to assume her parental responsibilities at this time or in the near future. The court found appellant has been diagnosed with bi-polar disorder, personality disorder and post-traumatic stress disorder.

{¶ 58} The court determined that "[t]hroughout this case, the chief concern of the agency and this court has been mother's inability to consistently manage her explosive anger and the intimidating behavior that accompanies the anger." The court noted that the case was initiated because of appellant's behavior at the hospital after K.K. suffered burns in March 2010. Although the children were placed back in appellant's temporary custody, they were removed a second time in December 2011 due to concerns that appellant had physically and emotionally abused K.K.

{¶ 59} The court found that throughout the case, the evidence demonstrated that appellant has a volatile temper. The court reviewed angry episodes with many of the therapists, police officers and caseworkers. The court also noted that Dr. Onady accepted appellant as a patient after a disagreement with another doctor, but appellant was then terminated from Dr. Onady's care due to abusive treatment of the office staff. The court further noted that both family therapists testified that appellant had angry and combative

behavior which led to their decision to terminate her from family therapy sessions.

{¶ 60} The court indicated that appellant's therapist testified at length that she has made some improvements in her ability to use anger management techniques she has learned in therapy. The court concluded, however, that it was not convinced based on the three years the case was pending, that appellant has demonstrated a sufficient ability to curb her volatility on a regular basis. The court noted that it was not until mid-2012, after the case was already over two years old, that appellant finally began to exhibit some progress in her anger management. The court stated that during appellant's testimony, "she virtually seethed with anger against BCDJFS, squarely blaming her predicament on the caseworkers and agency's supervisors."

{¶ 61} The court concluded that appellant took little responsibility for her own actions and how those actions have caused the children to languish in foster care or with relatives. The court found that appellant "continues to argue that society in general is to blame for her problems, despite all of the help that she has been provided by BCDJFS and the case plan providers, including her own therapist and guardian ad litem."

{¶ 62} The court found that based on reviewing all of the evidence, it was not convinced the children would be safe from further emotional and physical abuse if placed back in appellant's custody. The court reviewed the testimony of the therapists involved in the case and found that appellant has not been receptive to any criticism or direction from the family therapists and has insisted that her own therapist and guardian ad litem be present at visits to keep her calm. The court found there were concerns about appellant's ability to handle her children in an emotionally sound manner if they were returned. In addition, the court found that appellant's therapist testified that because of K.K.'s own behavioral and emotional issues, she needs a caregiver capable of providing understanding, patience,

unconditional love and good routines to meet her needs. The court concluded that there are serious concerns about whether appellant is stable enough to meet her children's needs in a crisis in a calm, patient manner, when she is unable to attend visits without help and cannot engage in family therapy with her children.

{¶ 63} The court also considered the fact that despite appellant's recent progress in anger management with her therapist, police were called in December 2012 because of a reported argument involving appellant. The court noted that on that date, appellant was arrested for an outstanding warrant and while the case has been pending, appellant was arrested several times, usually involving issues of anger and confrontation. Finally, the court found that although caseworkers testified they spoke with numerous persons, there are no other appropriate persons available to parent the child. Based on a review of the facts relevant to this factor, the court determined that a legally secure placement cannot be achieved for K.K. without a grant of permanent custody to the agency.

{¶ 64} With regard to other best interest factors, the court found that K.K.'s father abandoned her based on the fact that he has had no contact with the child since the case began in March 2010. The court also reviewed the history of the case and determined that after 36 months, appellant failed to remedy the conditions that caused K.K. to be placed outside her home. Based on a review of all the factors, the court concluded that it was in K.K.'s best interest to be placed in the permanent custody of the agency.

{¶ 65} On appeal, appellant raises issues regarding her progress in mental health treatment and other aspects of the case plan, her love and bond with the children, and the effect of granting permanent custody of K.K. on her relationship with her brothers, and she argues that she is making progress. She also disputes much of the testimony and attributes problems with children services to personality conflicts.

{¶ 66} Appellant's arguments on appeal largely center on differing views of appellant's progress and the manner of her interaction with persons involved, including the children. However, issues of credibility are for the trier of fact, not the appellate court, to determine. *In re G.N.*, 170 Ohio App.3d 7, 2007-Ohio-126, ¶ 24 (12th Dist.). It is well-established that the juvenile court had the opportunity to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the testimony. *In re B.J.*, 12th Dist. Butler No. CA2011-10-192, 2012-Ohio-3127, ¶ 20. Deferring to the trial court on matters of credibility is "crucial in a child custody case, where there may be much evidence in the parties' demeanor and attitude that does not translate to the record well." *Davis v. Flickinger*, 77 Ohio St.3d 415, 419 (1997).

{¶ 67} We have carefully reviewed the evidence in this case and find that the trial court's findings are supported by the record. The trial court considered and weighed the evidence in light of each of the factors, including the effect of granting permanent custody on the sibling relationship, and in a thorough decision made findings that are supported by the record. Appellant's first assignment of error is overruled.

## Legal Custody of K.B. and Z.B.

{¶ 68} In her second and third assignments of error, appellant argues that the trial court's decisions to award legal custody of K.B. to his father and to award legal custody of Z.B. to his paternal grandmother are against the manifest weight of the evidence.

{¶ 69} Unlike permanent custody, legal custody does not terminate the parent-child relationship; rather the parent retains residual parental rights and responsibilities. *In re M.A.*, 12th Dist. Butler No. CA2011-02-030, 2012-Ohio-545, ¶ 16. When determining legal custody pursuant to an action involving an abused, neglected or dependent child, the paramount concern is the best interest of the child and the court should consider the totality of the

circumstances affecting the best interest of the child. *Id.*

{¶ 70} An appellate court reviews a juvenile court's custody determination for an abuse of discretion. *Id.* at ¶ 1. An abuse of discretion implies that the trial court acted unreasonably, arbitrarily, or unconscionably. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). The discretion afforded to a juvenile court in custody matters "should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned. The knowledge a trial court gains through observing the witnesses and the parties in a custody proceeding cannot be conveyed to a reviewing court by a printed record." *In re A. W.-G.*, 12th Dist. Butler No. CA2003-04-099, 2004-Ohio-2298, ¶ 6, quoting *Miller v. Miller*, 37 Ohio St.3d 71, 74 (1988).

{¶ 71} Accordingly, an appellate court will not reverse a judgment as being against the manifest weight where the "award of custody is supported by a substantial amount of credible and competent evidence." *In re T.M.*, 12th Dist. Butler No. CA2007-01-019, 2007-Ohio-6034, ¶ 28, citing *Davis v. Flickinger*, 77 Ohio St.3d 415 (1997).

{¶ 72} Appellant argues in her second assignment of error that the court abused its discretion in awarding legal custody of K.B. to his father because the child had little prior contact with his father, the Alabama home study was denied due to the father's criminal history and because K.B. will be separated from other family members due to the distance between Alabama and Ohio.

{¶ 73} The trial court considered the best interest factors as they relate to K.B. and found that K.B. did not have a relationship with his father until the summer of 2011. The court found that the father testified that he did not learn of K.B.'s existence until a few years ago. The court indicated that during the case, the father was in prison part of the time, but during the summer of 2011, appellant sent K.B. to Alabama for several weeks to visit his

father. During this time, K.B. also met many of his paternal relatives who reside in the same area, including his father's other children.

**{¶ 74}** The court also found that the father appeared in court on June 15, 2012 and began driving to Ohio to attend court hearings and also attended visits with K.B. at the agency. The court indicated that the father attended all subsequent hearings except one where the court excused his attendance due to vacation time issues. The court further found that the father would typically drive all night from Alabama to be present at hearings. The court found the father has been employed with the same company for over a year, has several children he supports and coaches football and basketball. The court also found that the father has numerous relatives living nearby to provide a support system. The court noted that the caseworker observed a visit and indicated that the two have a comfortable, warm relationship and the father is encouraging and supportive of the child.

**{¶ 75}** The court continued by noting that the interstate home study on father was denied due to the father's criminal history and current probationary status. However, the court determined that the father was very open about his criminal history and the last conviction was in 2008 for possession of a firearm by a felon. In addition, K.B.'s current foster family was requesting that the child be placed in another foster home. The court also considered the guardian ad litem's recommendation that K.B. be placed in the legal custody of his father. The court also considered whether K.B. could be placed with appellant and for the same reasons as discussed above regarding K.K., found that K.B. could not be placed with appellant.

**{¶ 76}** The court considered the evidence and the factors weighing against the father, but found that since his release from prison, the father appears to have achieved stability in his life. The court found that these facts, along with consideration of K.B.'s current age of 14

and the lack of any concerns during K.B.'s visit in 2011, weighed in favor of placing K.B. with his father.

{¶ 77} After reviewing the record, we find no error in the trial court's decision to place K.B. in the legal custody of his father. Although there were some concerns based on the father's criminal history and the amount of prior contact, the court weighed these facts with the father's current stability, familial support system, and dedication to his son and determined it was in K.B.'s best interest to be placed with his father. The trial court's decision is not against the manifest weight of the evidence. Accordingly, appellant's second assignment of error is overruled.

{¶ 78} In her third assignment of error, appellant argues that the court abused its discretion in awarding legal custody of Z.B. to his paternal grandmother because appellant was making progress in therapy. She essentially reiterates the same arguments in her first assignment of error, arguing that the evidence was conflicting regarding her behavior and that she has been actively involved in mental health treatment.

{¶ 79} In the same manner as in K.K. and K.B.'s cases, the court considered whether Z.B. could be placed with appellant and found that he could not be placed with her within a reasonable time. The court indicated that Z.B.'s father was incarcerated for a period of time from 2011-2012 and since his release, the grandmother has supervised visits between Z.B. and his father. The court considered the guardian ad litem's report and recommendation that Z.B. be placed with his paternal grandmother.

{¶ 80} The court indicated the grandmother has continued to meet the child's needs and provide a stable home for the child for over a year. She enrolled Z.B. in football and baseball. The grandmother helps Z.B. with his homework every day and the child achieves good grades and has made friends at school. The court also indicated that it considered the

in camera interview with the child. Based on consideration of all the facts, the trial court concluded that it was in Z.B.'s best interest to be placed in the legal custody of his grandmother.

{¶ 81} After reviewing the record in this case, we find no error in the trial court's decision. For the reasons discussed above, the court did not err in finding Z.B. could not be placed with appellant. The grandmother has been providing a safe, stable home for the child for over a year where he is doing well. The guardian ad litem recommended that legal custody of the child be granted to the grandmother. The trial court's decision is not against the manifest weight of the evidence. Appellant's third assignment of error is overruled.

### Hearsay

{¶ 82} In her fourth assignment of error, appellant argues that the trial court erred in allowing hearsay evidence in the form of a report from K.K.'s preschool and the testimony of caseworker Carla Day. Appellant concedes that these issues were not raised in objections and are therefore subject to review for plain error.

{¶ 83} Hearsay is inadmissible in hearings on motions for permanent custody. *In re W.R.*, 12th Dist. Fayette No. CA2011-08-016, 2012-Ohio-382, ¶ 22. However, it is well-established that as the fact-finder, a trial court is presumed to have considered only properly admissible evidence unless the record affirmatively demonstrates otherwise. *In re A.F.*, 12th Dist. Butler No. CA2011-12-233, 2012-Ohio-2958, ¶ 33. Therefore, the admission of hearsay evidence in cases involving the termination of parental rights, even if error, is not considered prejudicial unless it is shown that the judge relied on improper evidence in making his decision. *In re C.J.*, 8th Dist. Cuyahoga No. 100532, 2014-Ohio-2403.

{¶ 84} Appellant first argues that the trial court erred in admitting a report prepared by the director of K.K.'s preschool. She argues that the report included information from other

preschool workers and the director testified that she was asked to prepare the report for court. She argues that the information in the report included K.K.'s issues with anger and aggression and that the director testified extensively over objection about the content of the information. Appellant also argues that the court erred in allowing caseworker Carla Day to testify that the Middletown police believed that appellant physically abused K.K. in the December 2011 incident.

{¶ 85} Appellant contends that the prejudicial effect of this information is "apparent" because the court indicated the paramount issue in the case was appellant's anger and children's reaction to the anger. She further contends that prejudice from the statement regarding Middletown police is apparent because the court indicated it was concerned about the children's safety and the only allegation of physical harm was from the December 2011 incident.

{¶ 86} Regardless of whether the evidence is hearsay, appellant fails to establish that she was prejudiced in any manner by either the preschool director's report or by the statement involving the Middletown police. In both instances, the evidence was presented in other form.

{¶ 87} First, the evidence in the preschool director's report was corroborated by other witnesses who testified regarding matters in the report, including the director herself and K.K.'s therapist at the preschool. In addition, several witnesses testified regarding appellant and K.K.'s behavior. Accordingly, as there was other evidence of appellant's anger issues, and K.K.'s issues, appellant has not established that this report was the basis for the trial court's determinations regarding appellant's anger and K.K.'s emotional issues. In addition, when the court admitted the report, it indicated that it would consider the portions of the report regarding matters the director personally observed, but the court stated that the report

also included hearsay, which it would not consider. Given that the court clearly understood the report contained hearsay and stated it would not consider those portions of the report, appellant has not established any prejudice by its admission.

**{¶ 88}** With regard to the statement regarding the Middletown Police Department, appellant has also failed to establish prejudice from this statement. The record contains several statements regarding the removal of the children in December 2011, and that appellant was charged with domestic violence following the incident. The nature of the injuries was the subject of a prior hearing before the court and the basis of an emergency shelter care hearing. In addition, appellant has not established that the court relied on this incident, and not appellant's propensity for anger and aggression in discussing concern for the physical and emotional safety of the children.

**{¶ 89}** As appellant has not established she was prejudiced by the statements, appellant's fourth assignment of error is overruled.

**{¶ 90}** Judgment affirmed

HENDRICKSON, P.J., and PIPER, J., concur.