[Cite as *In re A.J.*, 2018-Ohio-4941.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

FAYETTE COUNTY

| | | |
|---|---|---|
| IN THE MATTER OF: | : | |
| A.J. | : | CASE NO. CA2018-08-014 |
| | : | O P I N I O N<br>12/10/2018 |
| | : | |
| | : | |

APPEAL FROM FAYETTE COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case No. AND20170335

Steven H. Eckstein, 1208 Bramble Avenue, Washington C.H., Ohio 43160, for appellant, Father

Jess C. Weade, Fayette County Prosecuting Attorney, Sean M. Abbott, Fayette County Courthouse, 110 East Court Street, Washington C.H., Ohio 43160, for appellee, Fayette County Children Services

**HENDRICKSON, P.J.**

{¶ 1} Appellant, the biological father of A.J. ("Father"), appeals the decision of the Fayette County Court of Common Pleas, Juvenile Division, granting permanent custody of A.J. to appellee, Fayette County Children Services ("FCCS"). For the reasons outlined below, we affirm the juvenile court's permanent custody determination.

**Facts and Procedural History**

{¶ 2} A.J. was born on November 14, 2015. Approximately 16 months later, A.J.'s

younger brother, D.D., was born. At the time of his birth, D.D. tested positive for morphine and opiates. Shortly after D.D.'s birth, FCCS entered into an agreement with A.J. and D.D.'s biological mother ("Mother") and maternal grandmother ("Grandmother"). The agreement required Mother to cooperate with the Fayette County Health Department in obtaining substance abuse treatment to address her addiction to heroin.[1] The agreement also prohibited Mother from having unsupervised visitation time with any of her four children, C.E., M.J., A.J., and D.D. At the time the agreement was entered into, it is undisputed that Mother's four children were then in the temporary custody of Grandmother.

{¶ 3} On May 23, 2017, FCCS learned that Mother was having unsupervised visitation time with her four children. FCCS also learned that Mother had not received the agreed upon substance abuse treatment. Mother, however, had nevertheless told Grandmother that she had received treatment for her heroin addiction. Upon learning Mother had not received any treatment for her substance abuse issues, Grandmother withdrew from the agreement with FCCS and refused to participate further. Per the agreement between Mother, Grandmother, and FCCS, all four of Mother's children were then removed from Mother's care and placed in foster care or kinship placements. A.J., the child subject of this appeal, was one of the children placed in a foster home. A.J. has remained in the same foster home with the same foster family ever since being removed from Mother and Grandmother's care.

{¶ 4} On June 21, 2017, FCCS filed a complaint alleging A.J. was a neglected and dependent child. In support, FCCS alleged Mother's whereabouts were then unknown and that the identity of A.J.'s biological father had yet to be established. FCCS also alleged Mother had admitted using drugs for the past eight years, that she used drugs during her pregnancy with D.D., and that she had continued to use drugs even after D.D.'s birth. FCCS

---

1. Mother is not a party to this appeal and the record indicates her whereabouts are currently unknown.

further alleged that "[s]ince entering into the agreement of care [Mother] has made no progress on her case plan and has not checked in with her caseworker." Therefore, because FCCS had been unable to contact Mother to discuss any further action in the matter, FCCS requested temporary custody of A.J. The juvenile court granted emergency temporary custody of A.J. to FCCS later that day.

{¶ 5} On August 17, 2017, the juvenile court held an adjudication hearing. Following this hearing, the juvenile court adjudicated A.J. a neglected and dependent child. Approximately one month later, the juvenile court held a disposition hearing and issued a dispositional decision finding it was in A.J.'s best interest to be placed in the temporary custody of FCCS. As part of this decision, the juvenile court noted that A.J. had been placed in a foster home and that she was bonded to her foster family. The juvenile court also noted that A.J.'s medical concerns had been addressed appropriately by her foster family since being placed in foster care. Two months later, in October 2017, Father was determined to be A.J.'s biological father. At the time paternity was established, it is undisputed that Father was in prison serving a three-year term for possession of drugs.

{¶ 6} On December 6, 2017, A.J.'s paternal-great-aunt ("Aunt") filed a pro se complaint for legal custody of A.J. In support of her complaint, Aunt stated that "as family members" she and her husband would like to be awarded custody of A.J. "until the parents are able to properly care for the child." At the time Aunt filed her complaint it is undisputed that she lived in Maryland. It is also undisputed that Aunt had had never had any physical face-to-face contact with A.J. prior to filing her complaint. Rather, as the record indicates, Aunt had only seen A.J. on a series of video calls with Mother shortly after her birth.

{¶ 7} On March 16, 2018, FCCS filed a motion for permanent custody of A.J. In support of its motion, FCCS argued A.J. had been abandoned by Mother and Father since neither had any contact with A.J. after she was adjudicated a neglected and dependent child.

FCCS also argued that it was in A.J.'s best interest that permanent custody be awarded, that Father had not participated with the agency in any meaningful way, and that Father had not engaged in any case plan services. The juvenile court then appointed a guardian ad litem for A.J., who, after investigating the matter further, issued a report and recommendation to the juvenile court recommending FCCS's motion for permanent custody be granted.

{¶ 8} On July 17, 2018, the juvenile court held a hearing on FCCS's motion for permanent custody. As part of this hearing, the juvenile court heard testimony from Father, Aunt, and two caseworkers with FCCS. During this hearing, a caseworker testified regarding A.J.'s success after being placed in foster care as follows:

> [A.J.'s] doing so well, she has made so much progress since being with [her foster parents]. When she came into care she had bowed legs and would not talk to anyone. She had stranger danger and needed therapy for her legs. Since then she has received that therapy up at Nationwide Children's Orthopedic Unit. She engages in conversation with the family and with myself and I'm seeing her in the home. She's hitting all of her milestones and, and doing very well.

{¶ 9} After taking the matter under advisement, the juvenile court issued a decision granting FCCS's motion for permanent custody. In so holding, the juvenile court determined that both Mother and Father had abandoned A.J. Specifically, as the juvenile court found, "[Father] visited A.J. on March 13, and 20 of 2018. Other than those visits there has been no contact by any parent with [A.J.] since [Mother] last visited in June, 2017." Concluding, the juvenile court determined FCCS had proved by clear and convincing evidence that a grant of permanent custody was in A.J.'s best interest.

**Appeal**

{¶ 10} Father now appeals from the juvenile court's decision granting FCCS's motion for permanent custody. In support of his appeal, Father argues the juvenile court's decision to grant FCCS permanent custody was not supported by sufficient credible evidence and was otherwise against the manifest weight of the evidence. Under these circumstances, this court

applies the following standard of review.

**Standard of Review**

{¶ 11}   Before a natural parent's constitutionally protected liberty interest in the care and custody of his child may be terminated, the state is required to prove by clear and convincing evidence that the statutory standards for permanent custody have been met. *In re K.W.*, 12th Dist. Butler No. CA2015-06-124, 2015-Ohio-4315, ¶ 11, citing *Santosky v. Kramer*, 455 U.S. 745, 759, 102 S.Ct. 1388 (1982).  An appellate court's review of a juvenile court's decision granting permanent custody is generally limited to considering whether sufficient credible evidence exists to support the juvenile court's determination. *In re M.B.*, 12th Dist. Butler Nos. CA2014-06-130 and CA2014-06-131, 2014-Ohio-5009, ¶ 6.  This court will therefore reverse a juvenile court's decision to grant permanent only if there is a sufficient conflict in the evidence presented. *In re K.A.*, 12th Dist. Butler No. CA2016-07-140, 2016-Ohio-7911, ¶ 10.  However, even if the juvenile court's decision is supported by sufficient evidence, "an appellate court may nevertheless conclude that the judgment is against the manifest weight of the evidence." *In re T.P.*, 12th Dist. Butler No. CA2015-08-164, 2016-Ohio-72, ¶ 19.

{¶ 12}   As with all challenges to the manifest weight of the evidence, in determining whether a juvenile court's decision is against the manifest weight of the evidence in a permanent custody case, an appellate court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered." *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20.  The presumption in weighing the evidence is in favor of the finder of fact, which we are especially mindful of in custody cases. *In re C.Y.*, 12th Dist. Butler Nos. CA2014-11-231 and CA2014-11-236 thru CA2014-11-238,

2015-Ohio-1343, ¶ 25. Therefore, "[i]f the evidence is susceptible to more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment." *Eastley* at ¶ 21.

**Two-Part Permanent Custody Test**

{¶ 13} Pursuant to R.C. 2151.414(B)(1), the juvenile court may terminate parental rights and award permanent custody of a child to a children services agency if the court makes findings pursuant to a two-part test. *In re G.F.*, 12th Dist. Butler No. CA2013-12-248, 2014-Ohio-2580, ¶ 9. First, the juvenile court must find that the grant of permanent custody to the agency is in the best interest of the child, utilizing, in part, the factors of R.C. 2151.414(D). *In re D.K.W.*, 12th Dist. Clinton No. CA2014-02-001, 2014-Ohio-2896, ¶ 21. Second, pursuant to R.C. 2151.414(B)(1)(a) to (e), the juvenile court must find that any of the following apply: (1) the child is abandoned; (2) the child is orphaned; (3) the child has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period; (4) where the preceding three factors do not apply, the child cannot be placed with either parent within a reasonable time or should not be placed with either parent; or (5) the child or another child in the custody of the parent from whose custody the child has been removed, has been adjudicated an abused, neglected, or dependent child on three separate occasions. *In re C.B.*, 12th Dist. Clermont No. CA2015-04-033, 2015-Ohio-3709, ¶ 10. Only one of these findings must be met to satisfy the second prong of the two-part permanent custody test. *In re A.W.*, 12th Dist. Fayette No. CA2014-03-005, 2014-Ohio-3188, ¶ 12.

**Abandonment**

{¶ 14} As it relates to the second part of the two-part permanent custody test, the juvenile court found both Mother and Father had abandoned A.J. This is because, as determined by the juvenile court, both Mother and Father had at one point not had any

contact with A.J. for a period of more than 90 days. Father disputes the juvenile court's finding he had abandoned his daughter. We find no merit to Father's claim.

{¶ 15} Pursuant to R.C. 2151.011(C), "a child shall be presumed abandoned when the parents of the child have failed to visit or maintain contact with the child for more than ninety days, regardless of whether the parents resume contact with the child after that period of ninety days." As noted above, Father disputes the juvenile court's finding he abandoned A.J. Father instead argues the evidence contrary to the juvenile court's decision is "so strong as to overcome the presumption" of abandonment. Father, however, did not cite to any evidence within the record to support his claim. It is well-established that it is not this court's duty to search the record for evidence to support an appellant's argument as to any alleged assignment of error. *See* App.R. 16(A)(7) ("appellant shall include in its brief * * * citations to the authorities, statutes, and parts of the record on which appellant relies").

{¶ 16} Regardless, even if Father had cited to evidence in the record, the record is nevertheless clear that Father failed to visit or maintain any contact with A.J. after he last visited with A.J. on March 20, 2018 up to when the juvenile court held its hearing on FCCS's motion for permanent custody on July 17, 2018 – a period of 119 days. Because the record is clear that Father failed to visit or maintain any contact with A.J. for a period of more than 90 days, Father's claim that the juvenile court should have instead "started its calculation of abandonment" on the date paternity was established in October 2017 is moot.[2]

{¶ 17} Father also argues the juvenile court erred by finding he had abandoned A.J. because any failure to visit or maintain contact with A.J. was a result of FCCS terminating his visitation time after only two visits. This, according to Father, was nothing short of an

---

2. It should be noted, even if Father's claim was not rendered moot, this court has already determined that such a claim lacks merit. *See In re K.R.*, 12th Dist. Warren Nos. CA2017-02-015, CA2017-02-019, and CA2017-02-024, 2017-Ohio-7122, ¶ 32 (denying a father's claim that a juvenile court erred by finding he had abandoned his child because paternity had yet to be established).

"unjustified forced termination of his visitation with A.J. by the agency[.]"[3]  However, contrary to Father's claim otherwise, the record is clear that Father's visitation time was terminated by FCCS after A.J. experienced significant regression in her behavior immediately following each of his two visits with her.  Specifically, as a case worker testified regarding A.J.'s behavior immediately after her visitation time with Father:

> [A.J.'s] behavior regressed tremendously by approximately six months.  She was throwing herself down on the floor and essentially throwing temper tantrums.  She would scream for 20 minutes at a time and it would last the rest of the day.  This would last for three or four days after a visitation.

Concerns regarding A.J.'s behavior were so severe that A.J. was taken to the doctor by her foster parents.  Considering A.J.'s regression following each of her two visits with Father, we find nothing improper about FCCS's decision to terminate Father's visitation time after only two visits.  Father's claim otherwise lacks merit.

{¶ 18}  Father next argues FCCS was too hasty in its decision to terminate his visitation time. This is because, according to Father, his visitation time with A.J. should have been terminated only after FCCS received a recommendation to terminate his visitation time from a medical professional.  However, although Father suggests otherwise, there is no requirement that FCCS receive a recommendation from any medical professional before it could terminate either parent's visitation time with A.J.  Simply stated, the decision whether to permit Father visitation time was at the discretion of FCCS.[4]  FCCS chose to terminate Father's visitation time after A.J. experienced significant regression in her behavior immediately following each of his two visits with her. We find nothing improper about FCCS's decision.

---

3. Father also faults FCCS for not adding him to Mother's case plan.  However, as a caseworker testified, because Father never expressed an interest in obtaining custody of A.J., "we did not add him to the case plan."

4. The record indicates a caseworker attempted to call Father to explain why his visitation time with A.J. was being terminated.  Father never returned the caseworker's phone call.

{¶ 19} The plain language found in R.C. 2151.011(C) provides that a child is "abandoned when the parents of the child have failed to visit *or* maintain contact with the child for more than ninety days[.]" (Emphasis added.) In turn, under most circumstances, a finding of abandonment would have been improper had Father either visited with A.J. or maintained the necessary contact with A.J. following her birth – so long as there was never a gap in time of more than 90 days. Here, the record is clear that Father neither visited nor maintained contact with A.J. for a period of 119 days, 29 days more than what was necessary for the juvenile court to make a finding of abandonment. Therefore, because the record fully supports the juvenile court's decision, we find no error in the juvenile court's decision finding Father had abandoned A.J. This is because, as the juvenile court found, "Father has had no other involvement with the child" following his visit with A.J. on March 20, 2018 – a full 119 days before the hearing on FCCS's motion for permanent custody was held on July 17, 2018.

**Best Interest of A.J.**

{¶ 20} Turning now to the first part of the two-part permanent custody test, the juvenile court found it was in A.J.'s best interest to grant permanent custody to FCCS. Father disputes the juvenile court's best interest determination. It is undisputed that Father never requested to have custody of his daughter. Father instead argues that Aunt should have been granted legal custody of A.J. We again find no merit to Father's claim.

{¶ 21} When considering the best interest of a child in a permanent custody case, the juvenile court is required under R.C. 2151.414(D)(1) to consider certain enumerated factors. *In re D.E.*, 12th Dist. Warren Nos. CA2018-03-035 and CA2018-04-038, 2018-Ohio-3341, ¶ 32. These factors include, but are not limited to, (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child; (2) the wishes of the

child, as expressed directly by the child or through the child's guardian ad litem; (3) the custodial history of the child; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any of the factors listed in R.C. 2151.414(E)(7) to (11) apply in relation to the parents and child. *In re J.C.*, 12th Dist. Brown No. CA2017-11-015, 2018-Ohio-1687, ¶ 22. The juvenile court may also consider any other factor(s) it deems relevant to the child's best interest. *In re N.R.S.*, 3d Dist. Crawford Nos. 3-17-07 thru 3-17-09, 2018-Ohio-125, ¶ 15 ("[t]o make a best interest determination, the trial court is required to consider all relevant factors listed in R.C. 2151.414[D], as well as any other relevant factors").

{¶ 22} Initially, with respect to A.J.'s relevant interactions and relationships with those who may significantly impact her young life, the juvenile court reiterated its previous finding that both Mother and Father had abandoned A.J. This is because, as the noted by the juvenile court, neither Mother nor Father had any contact with A.J. since Father's last visit on March 20, 2018 – a full 119 days before the hearing on FCCS's motion for permanent custody was held on July 17, 2018. The juvenile court also noted that A.J. was doing "very well" in her foster home, that her foster parents were interested in adopting her if FCCS was granted permanent custody, and that A.J., who was then just two years old, was talking and meeting her developmental milestones.

{¶ 23} On the other hand, as it relates to Aunt, the juvenile court noted that Aunt had never physically met A.J. in person. Rather, as the juvenile court found, the only contact Aunt had with A.J. was through a series of video calls with Mother shortly after her birth. The juvenile court further found that visitation time between A.J. and Aunt never transpired due, in part, to the fact Aunt wanted more visitation time than she was offered. Yet, due to the parties' busy schedules, the record indicates that providing Aunt with any additional visitation time was not feasible.

{¶ 24} The record also indicates Aunt chose not to exchange e-mail addresses with A.J.'s foster family when they offered to send her photographs of her niece. At the hearing on FCCS's motion for permanent custody, Aunt admitted that she had refused to exchange e-mail addresses with A.J.'s foster family at a previous hearing before the juvenile court. Aunt, however, claimed this was merely a result of her being "so overwhelmed by what had taken place" that she "ended up walking out of the courtroom."

{¶ 25} Next, regarding A.J.'s wishes, the juvenile court noted that A.J. was too young to express her wishes. The guardian ad litem, however, issued a report and recommendation that recommended granting FCCS's motion for permanent custody. This recommendation was based, at least in part, on the fact that A.J. appeared "very bonded with her foster family and they are open to adopting her if the opportunity arises." The guardian ad litem also testified that A.J.'s foster parents were "very interested in adoption" and that there was "absolutely no reason to believe that that [would] change." The juvenile court then noted that A.J. had been in the temporary custody of FCCS since June 21, 2017. The record supports the juvenile court's finding.

{¶ 26} Furthermore, regarding A.J.'s need for a legally secure placement, the juvenile court found A.J.'s need of a legally secure permanent placement could not be achieved without a grant of permanent custody to FCCS. The juvenile court's decision was based on its finding A.J. "had almost no interaction with [her] parents for the past year," that she was doing "very well" in her foster home, and that her foster parents were interested in adopting her if FCCS was granted permanent custody. Therefore, according to the juvenile court, granting FCCS permanent custody was "the only way to provide [A.J.] with a legally secure placement."

{¶ 27} Finally, with respect to any of the factors contained in R.C. 2151.414(E)(7) to (11), the juvenile court reiterated its previous finding that both Mother and Father had

abandoned A.J. since neither of them had at one point any contact with their daughter for a period of at least 90 days. Concluding, after taking into consideration the evidence presented and weight to be given to the witnesses' testimony, the juvenile court determined that "it would be contrary to the best interests of [A.J.] to be returned to the home, or to be placed with a family member."

{¶ 28} After a thorough review of the record, we find the record fully supports the juvenile court's decision to grant FCCS's motion for permanent custody. Father nevertheless argues the juvenile court erred by granting permanent custody to FCCS since he "never thought of abandoning his daughter and also that FCCS was never inclined to allow him the custody of the child." However, as noted above, Father never expressed any interest in obtaining custody of A.J. Yet, even then, there is nothing in the record to support Father's claims – particularly those claims alleging FCCS was somehow working against him to deny him access to A.J. Therefore, while it may be true that Father "never thought" of abandoning A.J., as noted above, the juvenile court's decision finding he had abandoned his daughter was supported by sufficient credible evidence and was not otherwise against the manifest weight of the evidence. Father's claims otherwise lack merit.

{¶ 29} Father also argues the entire process by which his relationship with A.J. was measured was "unfair" and denied him a "meaningful opportunity" to develop a relationship with his daughter. But, after a full and thorough review of the record, we find nothing improper in the manner in which FCCS managed this case when taking into account A.J.'s best interest. The juvenile court, just like this court on appeal, must act in a manner that places A.J.'s best interest above all else. "'A child's best interests are served by the child being placed in a permanent situation that fosters growth, stability, and security.'" *In re D.E.,* 12th Dist. Warren Nos. CA2012-03-035 and CA2018-04-038, 2018-Ohio-3341, ¶ 60, quoting *In re Keaton,* 4th Dist. Ross Nos. 04CA2785 and 04CA2788, 2004-Ohio-6210, ¶ 61. The

juvenile court's decision to grant permanent custody in this case does just that. This is because, as the juvenile court found, granting FCCS's motion for permanent custody "is the only way to provide [A.J.] with a legally secure placement." We agree with the juvenile court's decision.

**Aunt's Motion for Legal Custody**

{¶ 30} Aunt did not appeal from the juvenile court's decision denying her complaint for legal custody. Father, however, argues the juvenile court erred by denying Aunt's complaint because placing A.J. with Aunt would have allowed him to see his daughter. This may very well be true. But, as noted above, it is undisputed that Aunt had never physically met A.J. in person. Rather, as the record indicates, Aunt had only seen A.J. through a series of video calls with Mother shortly after her birth. The guardian ad litem raised the same concerns regarding Aunt's limited interactions with A.J. specifically noting that "[t]he relative that has filed for custody of [A.J.] admittedly has no relationship with [A.J.] and has never even had face to face contact with her." We agree with the juvenile court that placing A.J. with someone she has never physically met would not be in her best interest. This is particularly true here when considering A.J.'s strong bond with her foster family whom she had resided with in the same foster home for over a year.

{¶ 31} In so holding, we note that Aunt lives in Maryland, not Ohio. In turn, had the juvenile court granted Aunt's motion for legal custody, A.J. would have been forced to move many miles away from Mother's family and from her three siblings, C.E., M.J., and D.D. We also find significant Aunt's decision not to visit A.J. when offered visitation time by FCCS. This, according to the record, was because Aunt wanted more visitation time with A.J. than what was offered. Yet, as noted above, the record indicates that providing Aunt with any additional visitation time was not feasible due to the parties' busy schedules. The juvenile court took all these issues into consideration when issuing its permanent custody

determination.

{¶ 32} We also find significant Aunt's decision not to provide her e-mail address to A.J.'s foster family when they offered to send her photographs of her niece. The fact that Aunt choose not to take this minor step towards further developing her relationship with A.J. creates some question regarding Aunt's commitment to her niece. This is certainly the case here when considering A.J. was then just two years old and had otherwise very limited interaction with Mother, Father, and Aunt following her birth. Therefore, based on the facts and circumstances here, the juvenile court did not err by denying Aunt's complaint upon finding it was not in A.J.'s best interest to be placed with Aunt. Father's claim otherwise lacks merit.

**Conclusion**

{¶ 33} The juvenile court did not err in its decision to grant FCCS's motion for permanent custody of A.J. The juvenile court also did not err in its decision to deny Aunt's complaint for legal custody of her niece. Therefore, finding no merit to any of the arguments raised by Father herein, Father's two assignments of error are overruled, and the juvenile court's permanent custody determination is affirmed.

{¶ 34} Judgment affirmed.

PIPER and M. POWELL, JJ., concur.