[Cite as *In re S.M.*, 2019-Ohio-198.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY

| | | |
|---|---|---|
| IN THE MATTER OF: | : | CASE NOS. CA2018-08-088 |
| | | CA2018-08-089 |
| S.M., et al. | : | CA2018-08-090 |
| | | CA2018-08-091 |
| | : | CA2018-08-094 |
| | | CA2018-08-095 |
| | : | CA2018-08-096 |
| | | CA2018-08-097 |
| | : | |
| | : | O P I N I O N |
| | | 1/22/2019 |
| | : | |

APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case Nos. 17-D000069 thru 17-D000072

David P. Fornshell, Warren County Prosecuting Attorney, Kirsten A. Brandt, 520 Justice Drive, Lebanon, Ohio 45036, for appellee Warren County Children Services

Jeffrey E. Richards, 147 Miami Street, P.O. Box 536, Waynesville, Ohio 45068, for appellant mother

Dearie, Fischer & Mathews LLC, John A. Fischer, Greene Town Center, 70 Birch Alley, Suite 240, Beavercreek, Ohio 45440, for appellant father

**PIPER, J.**

{¶ 1} Appellants, the mother and father of S.M., J.R., W.M., and D.M. ("Mother" and "Father"), appeal the decision of the Warren County Court of Common Pleas, Juvenile

Division, granting permanent custody of their children to appellee, Warren County Children Services ("WCCS").

**The Parties**

{¶ 2} The children at issue are S.M. born October 26, 2010, J.R. born February 28, 2012, W.M. born October 15, 2013, and D.M. born on May 18, 2017. Mother has two other children, C.S. and P.P., neither of whom are part of this appeal. The record indicates C.S., who is now over the age of 18, was at one point in the legal custody of the state of Tennessee. On the other hand, P.P., who is now 13 years old, is in the legal custody of her maternal grandmother in Florida. Unlike S.M., J.R., W.M., and D.M., who are the biological children of Father, P.P.'s father is deceased. The identity of C.S.'s biological father is not within the record before this court.

{¶ 3} The record indicates Mother and Father had previously been involved with Montgomery County Children Services regarding S.M. and J.R. on an allegation of neglect. The allegation was based, at least in part, on concerns regarding truancy, as well as the children being infected with lice, and little to no food in the home. The case was closed by a Montgomery County caseworker after Mother and Father could not be located upon fleeing to Tennessee with the children.

{¶ 4} The record indicates two additional cases were opened in Tennessee regarding the children. One case dealt with Mother's oldest daughter, C.S., who, as noted above, was at one point in the legal custody of the state of Tennessee. The other case involved allegations of truancy regarding P.P. and S.M., who, from what this court can glean from the record, appear to have never been enrolled in school while living in Tennessee with Mother and Father. The record indicates this case was closed by a caseworker in Tennessee after Mother and Father could again not be located.

**Facts and Procedural History**

{¶ 5}  On May 21, 2017, three days after D.M. was born, WCCS filed a complaint with the juvenile court alleging the children were neglected and dependent.  In support of its complaint, WCCS alleged it received information that D.M. was born testing positive for amphetamines and methamphetamines.  The complaint indicates Mother also tested positive for amphetamines, methamphetamines, and marijuana upon her admission into the hospital.  Mother denied using amphetamines and methamphetamines but admitted that she had smoked marijuana daily during her pregnancy with D.M.

{¶ 6}  Continuing, WCCS alleged Mother told hospital staff that D.M. was her first child and that she and Father had just recently moved to Ohio from Tennessee for work.  However, when WCCS contacted Mother and Father shortly after D.M.'s birth, WCCS discovered the couple living in a small one-bedroom home with four additional children, S.M., J.R., W.M., and P.P., as well as five dogs.  As WCCS alleged in its complaint, "[a]ll the children were sleeping in the same room, and [J.R.] and [W.M.] were sharing a couch to sleep on."

{¶ 7}  WCCS also alleged the home where Mother and Father were living with the children was cluttered and in poor condition with little to no food in the home.  The record indicates the home was also dirty, had dog feces strewn throughout, and that the children were all infected with lice.  Concluding, WCCS alleged:

> It is unclear how long the family had been living in that home,
> however, Lebanon Police indicate they had visited the family
> home at least 6 months prior.  The children have not been
> enrolled in school since the family moved to this home.  Mother
> and Father both admitted to smoking marijuana that morning,
> but refused to submit to a drug screen from WCCS.

{¶ 8}  After receiving WCCS's complaint, the juvenile court granted WCCS's motion for emergency temporary custody of the children.  The children were then removed from

Mother and Father's care. At the time of their removal, the record indicates the children had problems with lying, stealing, and otherwise aggressive behaviors, as well as hitting, kicking, and biting. A Court Appointed Special Advocate ("CASA") was then appointed for the children. It is undisputed that since being removed from Mother and Father's care the children have remained in the same foster home with the same foster family. The record indicates the children are doing well in their foster home and are now developmentally on track for children their age.

{¶ 9} On July 27, 2017, the juvenile court held an adjudicatory hearing for the children. Following this hearing, the juvenile court adjudicated all of the children dependent. The juvenile court's decision was based on stipulations from Mother and Father confirming the general allegations alleged in WCCS's complaint. A case plan was then established for both Mother and Father that required them to, among other requirements, submit to random drug screens, complete drug, alcohol, and mental health assessments, as well as attend parenting classes and maintain safe and stable housing. Due to subsequent allegations of domestic violence, the case plan was thereafter amended to include additional requirements that both Mother and Father complete services to address the allegations of abuse.

{¶ 10} On August 16, 2017, the juvenile court held a dispositional hearing. Following this hearing, the juvenile court issued a dispositional decision finding it was in the children's best interests to be placed in the temporary custody of WCCS. In the months following, the record indicates Mother and Father did not successfully complete any of their case plan services. The record also indicates that Mother and Father visited the children only sporadically – neither one having more than three consecutive visits with the children.

{¶ 11} The record further indicates Mother and Father continued to use alcohol and

- 4 -

other illegal drugs throughout the pendency of this case. This includes on days when Mother and Father were scheduled to visit with the children. This ultimately resulted in both Mother and Father's visitation time with the children being suspended. It is undisputed that Father had not had any contact with the children since November of 2017, whereas Mother had not had any contact with the children since January of 2018.

{¶ 12} On April 30, 2018, WCCS moved for permanent custody of the children. In support of its motion, WCCS alleged that neither Mother nor Father had made sufficient progress in their case plan services. WCCS also alleged that the children could not be placed with either Mother or Father within a reasonable time nor should the children be placed with Mother or Father. This was true despite the reasonable efforts of WCCS to reunify the children with Mother and Father and the services required by their respective case plans. Concluding, WCCS alleged that there was a reasonable possibility that the children would be adopted by their current foster family if permanent custody was granted.

{¶ 13} On July 16, 2018, the juvenile court held a hearing on WCCS's motion for permanent custody. As part of this hearing, the juvenile court heard testimony from both Mother and Father, as well as two on-going caseworkers from WCCS.[1] Following this hearing, the juvenile court issued a decision granting WCCS's motion for permanent custody. In so holding, the juvenile court determined that both Mother and Father had abandoned the children after not having any contact with the children for a period of at least 90 days. The juvenile court also found that when considering the witness testimony, as well as the report and recommendation submitted by the CASA, WCCS had proved by clear and convincing evidence that a grant of permanent custody was in the children's best interests.

---

1. It should be noted that both Mother and Father arrived late to the permanent custody hearing without providing any explanation for their tardiness on the record.

**Appeal**

{¶ 14} Mother and Father now appeal the juvenile court's decision granting WCCS's motion for permanent custody. In support of their appeals, Mother and Father both argue the juvenile court's decision to grant permanent custody was not supported by sufficient credible evidence and was otherwise against the manifest weight of the evidence. Under these circumstances, this court applies the following standard of review.

**Standard of Review**

{¶ 15} Before a natural parent's constitutionally protected liberty interest in the care and custody of his or her child may be terminated, the state is required to prove by clear and convincing evidence that the statutory standards for permanent custody have been met. *In re K.W.*, 12th Dist. Butler No. CA2015-06-124, 2015-Ohio-4315, ¶ 11, citing *Santosky v. Kramer*, 455 U.S. 745, 759, 102 S.Ct. 1388 (1982). An appellate court's review of a juvenile court's decision granting permanent custody is generally limited to considering whether sufficient credible evidence exists to support the juvenile court's determination. *In re M.B.*, 12th Dist. Butler Nos. CA2014-06-130 and CA2014-06-131, 2014-Ohio-5009, ¶ 6. This court will therefore reverse a juvenile court's decision to grant permanent only if there is a sufficient conflict in the evidence presented. *In re K.A.*, 12th Dist. Butler No. CA2016-07-140, 2016-Ohio-7911, ¶ 10. However, even if the juvenile court's decision is supported by sufficient evidence, "an appellate court may nevertheless conclude that the judgment is against the manifest weight of the evidence." *In re T.P.*, 12th Dist. Butler No. CA2015-08-164, 2016-Ohio-72, ¶ 19.

{¶ 16} As with all challenges to the manifest weight of the evidence, in determining whether a juvenile court's decision is against the manifest weight of the evidence in a permanent custody case, an appellate court "weighs the evidence and all reasonable

inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered." *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20. The presumption in weighing the evidence is in favor of the finder of fact, which we are especially mindful of in custody cases. *In re C.Y.*, 12th Dist. Butler Nos. CA2014-11-231 and CA2014-11-236 thru CA2014-11-238, 2015-Ohio-1343, ¶ 25. Therefore, "[i]f the evidence is susceptible to more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment." *Eastley* at ¶ 21.

### Two-Part Permanent Custody Test

{¶ 17} Pursuant to R.C. 2151.414(B)(1), the juvenile court may terminate parental rights and award permanent custody of a child to a children services agency if the court makes findings pursuant to a two-part test. *In re G.F.*, 12th Dist. Butler No. CA2013-12-248, 2014-Ohio-2580, ¶ 9. First, the juvenile court must find that the grant of permanent custody to the agency is in the best interest of the child, utilizing, in part, the factors of R.C. 2151.414(D). *In re D.K.W.*, 12th Dist. Clinton No. CA2014-02-001, 2014-Ohio-2896, ¶ 21. Second, pursuant to R.C. 2151.414(B)(1)(a) to (e), the juvenile court must find that any of the following apply: (1) the child is abandoned; (2) the child is orphaned; (3) the child has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period; (4) where the preceding three factors do not apply, the child cannot be placed with either parent within a reasonable time or should not be placed with either parent; or (5) the child or another child in the custody of the parent from whose custody the child has been removed, has been adjudicated an abused, neglected, or dependent child on three

separate occasions. *In re C.B.*, 12th Dist. Clermont No. CA2015-04-033, 2015-Ohio-3709, ¶ 10. Only one of these findings must be met to satisfy the second prong of the two-part permanent custody test. *In re A.W.*, 12th Dist. Fayette No. CA2014-03-005, 2014-Ohio-3188, ¶ 12.

### Abandonment

{¶ 18} As it relates to the second part of the two-part permanent custody test, the juvenile court found both Mother and Father had abandoned the children. This is because, as noted by the juvenile court, neither Mother nor Father had visited or maintained any contact with the children for a period of at least 90 days. Although alleging she had no reasonable opportunity to see the children, Mother does not dispute the juvenile court's finding that she had abandoned the children. In fact, during the hearing on WCCS's permanent custody motion, when asked when she last saw the children, Mother testified, "[i]t's been a while." Father, however, claims the juvenile court's decision finding he abandoned the children was not supported by sufficient credible evidence. We find no merit to Father's claim.

{¶ 19} Pursuant to R.C. 2151.011(C), "a child shall be presumed abandoned when the parents of the child have failed to visit or maintain contact with the child for more than ninety days, regardless of whether the parents resume contact with the child after that period of ninety days." Father challenges the juvenile court's finding he had abandoned the children claiming it is "simply untenable" to permit WCCS to suspend his visitation time with his children only to then argue that he had abandoned the children by not visiting with them for a period of more than 90 days. However, contrary to Father's claim otherwise, the record is clear it was Father's own actions that caused suspension of his visitation time with the children. This includes, as noted by the juvenile court, Father's failure to visit with the

children for a period of six weeks prior to when his visitation was suspended and his failure to make any progress towards his case plan services. *See, e.g., In re S.M.*, 12th Dist. Warren No. CA2018-07-076, 2018-Ohio-4654, ¶ 15 (overruling appellant's claim she did not abandoned her children after her visitation time was suspended due to her repeated incarceration, unwillingness to attend appointments necessary to complete her case plan services, and failure to attend many of the scheduled visits with her child).

{¶ 20} Prior to the juvenile court's permanent custody hearing on July 16, 2018, the record indicates Father had not had any contact with the children since November of 2017 – a span of at least 228 days. Therefore, although it is undisputed that Father's visitation time with the children was suspended, the juvenile court's decision finding Father had abandoned the children was supported by sufficient credible evidence.[2] *See, e.g., In re B.C.*, 12th Dist. Warren Nos. CA2018-03-024 and CA2018-03-027, 2018-Ohio-2673, ¶ 19 (overruling appellant's claim she did not intentionally abandon her children after her visitation time was suspended upon finding it was appellant's "active choices that led to her inability to see the children"); *In re C.C.*, 12th Dist. Warren Nos. CA2011-11-113 and CA2011-11-127, 2012-Ohio-1291, ¶ 19 (juvenile court's finding of abandonment affirmed where juvenile court found "it was the parents' voluntary action in failing to consistently visit with the children, along with their failure to begin making any progress on the case plan, which led to the suspension of visitation"). Father's claim otherwise lacks merit.

{¶ 21} In so holding, we note that the plain language found in R.C. 2151.011(C)

---

2. Pursuant to R.C. 2151.414(B)(1)(a) and (E), the juvenile court also found the children could not be placed with either Mother or Father within a reasonable time or should not be placed with Mother or Father. Both Mother and Father claim the juvenile court's decision was not supported by the record. However, when considering the juvenile court properly found both Mother and Father had abandoned the children, we find Mother's and Father's arguments with respect to the juvenile court's findings under R.C. 2151.414(B)(1)(a) and (E) moot. This is because, as noted above, the juvenile court need only make one of the five findings enumerated in R.C. 2151.414(B)(1)(a) to (e) to satisfy the second prong of the two-part permanent custody test.

provides that a child is "abandoned when the parents of the child have failed to visit *or* maintain contact with the child for more than ninety days[.]" (Emphasis added.) As a result, due to the General Assembly's use of the conjunctive "or," under most circumstances, a finding of abandonment would have been improper had Mother or Father visited with the children or maintained the necessary contact with the children – so long as there was never a gap in time of more than 90 days. *In re A.J.*, 12th Dist. Fayette No. CA2018-08-014, 2018-Ohio-4941, ¶ 19. Based on a simple review of the record, it is clear that such a gap in time exists in this case.

{¶ 22} Here, the record is clear that neither Mother nor Father visited or maintained the necessary contact with the children for a period at least 90 days after the children were removed from their care on May 21, 2017 – a period of at least 166 days for Mother with a period of at least 228 days for Father. "Although the parents were unable to visit the children because visitations were suspended, there was no testimony that they were in any way prevented from maintaining contact with the children by other means, such as telephone calls, letters or cards." *See In re C.C.*, 2012-Ohio-1291 at ¶ 18. Therefore, because the record fully supports the juvenile court's decision on abandonment, we find no error in the juvenile court's decision finding both Mother and Father had abandoned the children.

**Best Interests of the Children**

{¶ 23} Turning now to the first part of the two-part permanent custody test, the juvenile court found it was in the children's best interests to grant permanent custody to WCCS. As noted above, both Mother and Father dispute this finding by arguing the juvenile court's decision was not supported by sufficient credible evidence and was otherwise against the manifest weight of the evidence. We find no merit to either Mother's or Father's claims.

{¶ 24} When considering the best interest of a child in a permanent custody case, the juvenile court is required under R.C. 2151.414(D)(1) to consider certain enumerated factors. *In re D.E.,* 12th Dist. Warren Nos. CA2018-03-035 and CA2018-04-038, 2018-Ohio-3341, ¶ 32. These factors include, but are not limited to, (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child; (2) the wishes of the child, as expressed directly by the child or through the child's guardian ad litem; (3) the custodial history of the child; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any of the factors listed in R.C. 2151.414(E)(7) to (11) apply in relation to the parents and child. *In re J.C.*, 12th Dist. Brown No. CA2017-11-015, 2018-Ohio-1687, ¶ 22. The juvenile court may also consider any other factors it deems relevant to the child's best interest. *In re N.R.S.,* 3d Dist. Crawford Nos. 3-17-07 thru 3-17-09, 2018-Ohio-125, ¶ 15 ("[t]o make a best interest determination, the trial court is required to consider all relevant factors listed in R.C. 2151.414[D], as well as any other relevant factors").

{¶ 25} Initially, with respect to the children's relevant interactions and relationships with those who may significantly impact their young lives, the juvenile court found the children have adapted to their foster home since being removed from Mother and Father's care and are now developmentally on track. The juvenile court also found S.M. and J.R. were "academically behind a year due to Mother and Father not prioritizing their educational needs," something their foster family has now corrected by having them repeat the academic year.

{¶ 26} In addition to these findings, the juvenile court further found the children's

needs are now being met upon their removal from Mother and Father's care. The juvenile court next noted that WCCS was optimistic that the children would be adopted by their foster family. Concluding, the juvenile court found that it was crucial for WCCS to obtain permanent custody so that it could continue its efforts to find "a permanent and stable home that the children deserve and need. Their only chance at stability is to be placed in the permanent custody of WCCS so they can arrange for the [c]hildren to be adopted."

{¶ 27} Next, regarding the children's wishes, the juvenile court did not state the children's wishes, likely due to their relatively young age. The juvenile court instead relied on the CASA's report and recommendation that permanent custody should be awarded to WCCS. Specifically, as the CASA stated regarding each the children's individual wishes:

> [S.M.] states that she wants to stay in her foster home. She reports being thankful for having a roof over her head (her words), the family being nice to her, there is no fighting in the home and there is no "whupping." She did not feel safe in her parents' home.
>
> [J.R.] would rather live with his parents, but he also told me he is "whupped" by them.[3]
>
> [W.M.] misses his parents, but likes living in his current home.
>
> Foster mother reports at various times, [S.M.], [J.R.] and [W.M.] have told her they want to see their parents but they don't want to live with them – they don't want to live with cockroaches any more.

{¶ 28} Moreover, as it relates to the children's custodial history, the juvenile court found the children had been in the temporary custody of WCCS since May 21, 2017. Neither Mother nor Father dispute this finding.

{¶ 29} Furthermore, when considering the children's need for a legally secure

---

3. The record indicates J.R. also asked a caseworker about visitation time with Mother and Father but noted that "they cancelled all the time anyway."

placement, the juvenile court found the children's need for a legally secure permanent placement could not be achieved without a grant of permanent custody to WCCS. This is because, as noted by the juvenile court, neither Mother nor Father had completed any of their case plan services. The juvenile court also found Mother and Father were unable to meet the children's needs and that Mother and Father have failed to otherwise remedy the conditions that resulted in the children's removal from their care. This included Mother and Father's continued alcohol and illegal drug use throughout the pendency of the case, as well as their unstable and unverifiable employment, income, and housing. Therefore, according to the juvenile court, "[a]doption is the best chance for the [c]hildren to achieve the stable family home they need. Their adoption is not possible without a grant of permanent custody to WCCS."

{¶ 30} Finally, with respect to any of the factors contained in R.C. 2151.414(E)(7) to (11), the juvenile court reiterated its previous finding that both Mother and Father had abandoned the children since neither Mother nor Father had any contact with the children for a period of at least 90 days. As discussed more fully above, the record supports the juvenile court's finding of abandonment.

**Analysis**

{¶ 31} After a thorough review of the record, we find the record fully supports the juvenile court's decision to grant WCCS's motion for permanent custody. Both Mother and Father dispute the juvenile court's decision. In support, Mother initially argues the juvenile court's decision was improper since she could neither read nor write, which prevented her from understanding the requirements set forth by her case plan. Considering the record indicates Mother informed WCCS she had looked for parenting classes to take on-line – an activity that requires the user to read – we question whether Mother is in fact illiterate.

- 13 -

Regardless, even assuming Mother's claims are true, as noted by the state, the fact that Mother cannot read or write does not explain why she did not complete the required case plan services.

{¶ 32} Mother never objected to the case plan established by WCCS nor did Mother ever indicate to either caseworker that she did not understanding what was required of her. This is likely because, as Mother testified, WCCS "read [the case plan] to me or they you know summed, summed it up for me."  Similarly, as one of the caseworkers testified regarding her interactions with both Mother and Father:

> [THE STATE]: Okay.  Um, directing your attention to the last page of the case plan um, did the parent, did you obtain the parent's signatures for this case plan?
>
> [CASEWORKER]: I did.
>
> [THE STATE]: Okay.  Did the parents understand that in order to reunify with their children they would need to successfully complete case plan services to alleviate the agency's original concerns?
>
> [CASEWORKER]: Yes.
>
> [THE STATE]: Did you have that conversation with the parents?
>
> [CASEWORKER]: Yes.

{¶ 33} Based on a full and thorough review of the record, and in light of the testimony set forth above, Mother simply cannot claim ignorance of requirements set forth by her case plan.  This is particularly true as to the requirement that Mother not use alcohol or illegal drugs during the pendency of this case.[4]  Such requirements, even if not explicitly set forth in the case plan, should be obvious to any parent seeking reunification with their children.

---

4. A caseworker testified that when Mother was confronted about her continued illegal drug use, "[Mother] said at that point in time she was just frustrated, and, had decided she was giving up um, because she wasn't doing what she needed to be doing, and, so therefore, she said that [Father] had given her meth, and, she did meth with [Father]."

This holds especially true for Mother here, who, as noted above, tested positive for amphetamines, methamphetamines, and marijuana upon her admission into the hospital prior to giving birth to D.M. Mother's claim otherwise lacks merit.

{¶ 34} The same is true regarding Mother's claim that WCCS did nothing to aid her in completing her case plan services. Contrary to Mother's claim, the record is clear that WCCS went to great lengths to help Mother complete her case plan. Mother, however, even with help from WCCS, did not take the time necessary to successfully complete any of these services. This is true even though Mother knew that successful completion of her case plan was integral part to her being reunified with the children. Simply stated, the record in no way indicates WCCS ignored Mother's needs in her quest to complete her case plan services. Mother must take responsibility for her own actions rather than ignoring her own failures by placing the blame on WCCS. This is chiefly true regarding Mother's decision to use illegal drugs (including admitted frequent marijuana use) during her pregnancy with D.M.

{¶ 35} Father similarly argues the juvenile court's decision to grant WCCS's motion for permanent custody was improper. In support, Father relies heavily on a caseworker's testimony that she believed it was possible that Father could complete his case plan services within six months. Father mischaracterizes the caseworker's testimony. As the caseworker testified:

> [FATHER'S TRIAL COUNSEL]: Um, do you believe if he engaged in services, so he's got a num (sic), a few classes um, do you believe if he engaged in services, and, and, put his mind to it he could complete the case plan in six (6) months?
>
> [CASEWORKER]: I mean it's hard to tell, he, they've had over the six (6) months to originally do it, and, some of, some of, some of the services had to be re-referred already so I mean is it possible? I guess it is possible.

- 15 -

This is hardly a ringing endorsement of Father and his ability to successfully complete his case plan services within six months as Father suggests.

{¶ 36} But, even if the case worker was emphatic in her belief that Father could complete his case plan services within six months, just as the caseworker testified, Father was given ample opportunity to prove that he could adequately and safely provide for the children during the many months after the children were removed from his and Mother's care. Yet, even when given time to turn his life around, Father continued to use alcohol and other illegal drugs during the pendency of this case. This includes Father testing positive for amphetamines, methamphetamines, and ecstasy on the day of the permanent custody hearing.

{¶ 37} The children are entitled to have stability in their lives by being placed in a legally secured permanent placement. The children simply cannot wait idly by in hopes that one day their parents can overcome their significant, nearly continuous substance abuse issues, as well as their lack of stable and verifiable employment, income, and housing. These issues are further exacerbated by the fact neither Mother nor Father have a valid driver's license or a functioning vehicle. The juvenile court, just like this court on appeal, must act in a manner that places the children's best interests above all else. "'A child's best interests are served by the child being placed in a permanent situation that fosters growth, stability, and security.'" *In re D.E.*, 12th Dist. Warren Nos. CA2012-03-035 and CA2018-04-038, 2018-Ohio-3341, ¶ 60, quoting *In re Keaton*, 4th Dist. Ross Nos. 04CA2785 and 04CA2788, 2004-Ohio-6210, ¶ 61. The juvenile court's decision to grant permanent custody to WCCS in this case does just that.

{¶ 38} Father also argues the juvenile court's decision was improper since he "made efforts" to complete his case plan. But, according to Father, such efforts were thwarted by

his busy work schedule. However, although required to do so by his case plan, the record indicates Father never provided WCCS with any documentation to verify his employment. Due to the litany of other issues calling into question Father's credibility, including the fact that Father vastly understated his substance abuse issues during his alcohol and drug assessment, we question whether Father had in fact obtained such employment. Yet, as this court has stated previously, deferring to the juvenile court on matters of credibility is crucial in these types of cases since the parties' demeanor and attitude does not translate well to the written record. *In re H.G.*, 12th Dist. Clinton No. CA2014-11-014, 2015-Ohio-1764, ¶ 44; *see, e.g., In re K.B.*, 12th Dist. Butler Nos. CA2014-02-042 thru CA2014-02-044, 2014-Ohio-3654, ¶ 66 ("issues of credibility are for the trier of fact, not the appellate court, to determine").

{¶ 39} That said, even assuming Father's testimony about his busy work schedule was true, it is well-established that "the case plan is 'simply a means to a goal, but not the goal itself.'" *In re E.B.*, 12th Dist. Warren No. CA2009-10-139, 2010-Ohio-1122, ¶ 30, quoting *In re C.C.*, 187 Ohio App. 3d 365, 2010-Ohio-780, ¶ 25 (8th Dist.). "[T]he key concern is not whether the parent has successfully completed the case plan, but whether the parent has substantially remedied the concerns that caused the child's removal from the parent's custody." *In re S.M.*, 12th Dist. Clermont No. CA2015-01-003, 2015-Ohio-2318, ¶ 24. Considering Father failed multiple drug tests during the pendency of this case, and had yet to obtain suitable housing for the children, it is clear that Father never remedied, let alone substantially remedied, any of the concerns that caused the children to be removed from his and Mother's care. Therefore, contrary to Father's claim otherwise, when the focus is on the children's best interests, the juvenile court's decision to grant permanent custody to WCCS was proper.

**Conclusion**

{¶ 40} The juvenile court did not err in its decision to grant WCCS permanent custody of S.M., J.R., W.M., and D.M. This is because, as discussed more fully above, the juvenile court's decision to grant permanent custody was supported by sufficient evidence and was otherwise not against the manifest weight of the evidence. As this court has stated previously, a parent is afforded a reasonable, not an indefinite, period to remedy the conditions causing the children's removal. *In re A.W.*, 2014-Ohio-3188 at ¶ 23. Despite having many months to do so, neither Mother nor Father remedied those conditions so as to regain custody of their children. Therefore, finding no merit to any of the arguments raised herein by Mother and Father both Mother's and Father's single assignments of error are overruled and the juvenile court's permanent custody determination is affirmed.

{¶ 41} Judgment affirmed.

HENDRICKSON, P.J., and S. POWELL, J., concur.