[Cite as *In re K.G.*, 2021-Ohio-1182.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

CLERMONT COUNTY

| | | |
|---|---|---|
| IN RE: | : | CASE NOS. CA2020-08-047 |
| | | CA2020-08-048 |
| K.G., et al. | : | CA2020-08-049 |
| | : | O P I N I O N |
| | | 4/7/2021 |
| | : | |

APPEAL FROM CLERMONT COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case Nos. 2018JC05072, 2018JC05073, and 2018JC05074

Stringer Law, LLC, Elizabeth Stringer, P.O. Box 382, Springboro, Ohio 45066, for appellant

Mark J. Tekulve, Clermont County Prosecuting Attorney, Nicholas A. Horton, 76 South Riverside Drive, 2nd Floor, Batavia, Ohio 45103, for appellee, Clermont County Department of Job and Family Services

Denise S. Barone, 385 North Street, Batavia, Ohio 45103, for appellee, Father

Shur Law, Co. LPA, Amie L. Wright, 4555 Lake Forest Drive, Suite 650, Cincinnati, Ohio 45242, guardian ad litem

Faris and Faris LLC, Matthew V. Faris, 40 South Third Street, Batavia, Ohio 45103, for prior custodian

**M. POWELL, J.**

{¶1}     Mother appeals the decision of the Clermont County Court of Common Pleas, Juvenile Division, which terminated her parental rights and granted permanent custody of her three children to the Clermont County Department of Job and Family Services

("CCDJFS" or "the agency"). The children subject of this appeal are K.G., born August 30, 2007, J.G., born July 5, 2011, and M.G., born May 10, 2013. The children's biological father ("Father") did not appeal the juvenile court's decision to grant permanent custody of the children to CCDJFS.

{¶2} For the reasons described below, this court affirms the juvenile court's decisions.

### Facts and Procedural History

{¶3} The agency initially became involved with Mother's children in 2016, when J.G. arrived to school in his pajamas and the school contacted children's services. At that point, the children began living with their maternal grandmother ("Grandmother").[1] Mother was subsequently evicted from her apartment and lived with Grandmother and the children for a short period. Thereafter, Mother tested positive for methamphetamine and the children remained in Grandmother's care.

{¶4} On April 19, 2018, CCDJFS filed complaints requesting the juvenile court grant it temporary custody of K.G., J.G., and M.G. The complaints alleged that K.G., J.G., and M.G. were neglected children. According to the complaints, an ongoing case was opened with Mother on May 17, 2017 due to concerns of drug use. The complaint alleged Mother had not completed any services requested by CCDJFS and had minimal to no contact with the agency. The complaint also alleged there was a "drug raid" at the home, where drugs and paraphernalia were discovered in the residence. CCDJFS attempted to locate alternate caregivers, however none were found.

---

1. Despite references in the record to Grandmother as the children's "custodian" and "legal custodian" there is nothing in the record reflecting that Grandmother was ever granted "legal custody" of the children by court order or that the children's residence with Grandmother was other than an informal arrangement between mother, CCDJFS, and Grandmother.

{¶5} Upon receiving CCDJFS's complaint, the juvenile court granted temporary custody of the children to the agency and appointed the children with a guardian ad litem. At that point, the children were placed together in a foster home.

{¶6} On May 22, 2018, an adjudication hearing was held before the juvenile court magistrate. Mother, Father, and Grandmother, as well as their counsel and the guardian ad litem, were present at the hearing. The magistrate adjudicated K.G., J.G., and M.G., as dependent children based upon the stipulation of the parties. On June 8, 2018, the juvenile court adopted the magistrate's adjudication decision.

{¶7} On July 5, 2018, the juvenile court magistrate held a dispositional hearing. At the hearing, Mother and Father consented to the agency receiving temporary custody of the children. The magistrate issued a decision memorializing the hearing, which included approving and journalizing the case plans for Mother, Father, and Grandmother.[2] The juvenile court subsequently adopted the magistrate's disposition decision in its entirety and granted temporary custody of the children to CCDJFS.

{¶8} The case plans required Mother and Father to implement stability in the children's lives and to participate in parent education. The case plan further required Mother and Father to remain drug free, to engage in drug treatment, and to follow all recommendations from their treatment. Mother and Father were required to obtain and maintain safe and appropriate housing, which included no criminal activity, drug activity, or unknown individuals in the home. Mother's case plan further required Mother to obtain and maintain income and to follow the terms of her probation. Father's case plan required

---

2. As Grandmother is neither a party to this appeal, a natural parent of the children, nor a person having or seeking legal custody of the children, we will restrict our discussion to Mother's and Father's case plan requirements and performance. We will refer to Grandmother and Grandmother's case plan requirements and performance only as relevant to Mother's arguments on appeal or the juvenile court's judgment granting the motion for permanent custody.

Father to obtain and maintain appropriate and safe housing, as well as income to support his family. The case plan further required Father to engage in a mental health assessment and follow all recommendations.

{¶9} Over the next several months, Mother regularly attended visitation with the children and made progress on her case plan services. However, while this case remained pending, Mother was charged with violating her probation as she had resumed trafficking in drugs and remained in contact with a boyfriend who was incarcerated for drug-related charges. Mother was also indicted on drug charges and attempted tampering with evidence stemming from the April 2018 drug raid at Grandmother's home. Mother was incarcerated in June 2019 on a prior theft charge and was subsequently placed in the residential MonDay program in August 2019. Mother's incarceration impeded her case plan progress.

{¶10} Like Mother, Grandmother was indicted on felony drug charges from the April 2018 drug raid at her home and was ultimately sentenced to 30 months in prison as a result of the charges.

{¶11} The record indicates Father's continued substance abuse prevented any progress on his case plan services. Father also did not regularly visit with the children and struggled to maintain a positive relationship with the children.

{¶12} On November 4, 2019, CCDJFS moved for permanent custody of the children. In support of its motions, CCDJFS alleged the children had been in the temporary custody of CCDJFS for 12 or more months of a consecutive 22-month period. The motions further alleged the children had been abandoned by Father and that they could not be placed with either of their parents within a reasonable time. CCDJFS further alleged that the best interests of the children would be served by an award of permanent custody to CCDJFS.

**The Permanent Custody Hearing**

{¶13} On January 24, 2020, a juvenile court magistrate held a hearing regarding the agency's motions for permanent custody.

{¶14} In support of the grant of permanent custody, CCDJFS first introduced the testimony of the lead attorney from the Clermont County Child Support Division. The attorney indicated Mother has a monthly court-ordered child support obligation for all three children. The monthly order totals $485.21, which includes an arrearage order of $79.28 per month. The attorney testified Mother currently owes $3,237.37 in arrears. At the time of the hearing, Mother was working at Frisch's and child support was deducted from her wages.

{¶15} The attorney also testified Father has a monthly support order, which totals $372.81 per month, and includes an arrearage order of $60.90 per month. According to the attorney, the child support division had utilized several administrative enforcement techniques against Father; however, he had never made a payment on the account. At the time of the hearing, Father owed $4,629.74.

{¶16} The CCDJFS caseworker assigned to the case testified that Father had not completed any of his case plan services. Father had not visited the children since March 2019 and had been unreachable since July 2019. With regard to Grandmother, the caseworker testified that due to the length of her incarceration, Grandmother was not in a position to receive custody of the children or comply with the requirements of her case plan.

{¶17} The caseworker noted that Mother was released from the MonDay program in December 2019, after successfully completing the program in six months. Prior to her placement in the MonDay program, Mother was incarcerated in the county jail from June 2019 until August 2019. At the time of the hearing, Mother was free from custody, but

remained on probation. The caseworker indicated Mother had not seen the children since her release from the MonDay program due to scheduling issues. Prior to her incarceration, Mother was consistently visiting with the children from April 2018, when the children were removed from Grandmother's care, until her incarceration in June 2019.

{¶18} The caseworker identified the agency's concerns with Mother's reunification with the children. Specifically, although Mother was working 20 hours a week, she did not have safe and suitable housing at the time of the hearing. The caseworker indicated Mother was living with her aunt, who was not willing to have the children in her home, and all other kinship or relative placements were unsuitable for the children. According to the caseworker, Mother stated she planned to find suitable housing after getting her driver's license reinstated and getting her car "on the road." The caseworker testified Mother "knows she can't [find suitable housing] at this moment." The caseworker was concerned about Mother's inability to provide stability for the children. Specifically, even after Mother has completed all aspects of the case plan, including obtaining suitable housing and income, she must demonstrate that she can maintain those things.

{¶19} The caseworker explained that during the time the children have been in CCDJFS's care, they have been in the same foster home, with foster parents who are meeting the needs of the children. According to the caseworker, the children are doing well in the foster home and the foster parents are willing to adopt the children if permanent custody was granted to the agency. Thus, the caseworker concluded the foster home is permanent placement for the children.

{¶20} The foster father of the children ("Foster Father") testified that he and his wife love the children and feel bonded with them. He further indicated the children seemed to love their foster parents right away. Foster Father said that the children were doing well,

excelling in school, and engaging in social activities with the family. All three children were involved in various sports at the time of the hearing. The children were attending counseling to address possible sexual abuse they may have suffered prior to their placement with the foster parents. Foster Father testified that the children enjoy an extended family that do "all the stuff" a family would do, including attending birthdays, movies, and vacations.

{¶21} Foster Father described the children's visits with Mother at the MonDay program. According to Foster Father, he and his wife took the children to visit Mother because they knew the children loved Mother, and the foster parents did not want to take away the children's opportunity to see Mother. Foster Father indicated the visits with Mother tended to trigger adverse behavioral changes in the children, such as forgetting the rules of the house and no longer behaving in their typical "mild mannered" ways.

{¶22} Foster Father confirmed his and his wife's intention to adopt the children and that they have the financial means and desire to raise the children. While Foster Father admitted he and his wife did not have the licensing to adopt the children at the time of the hearing, he testified "it's something that we can definitely get."

{¶23} The CCDJFS adoption supervisor testified that if permanent custody was granted to the agency, the children would be placed in the adoption unit within 45 days, and would begin the matching process within the following 90 days. The adoption supervisor indicated she hoped the children's foster parents would be approved for adoption by the time of the children's "match meeting," and the children could be placed with Foster Father and his wife.

{¶24} Mother testified at the hearing and indicated the agency should not be granted permanent custody and the children should be placed with her. Mother detailed the various case plan services she had completed throughout the case, including successfully

completing the MonDay program, as well as completing substance abuse treatment, parenting classes, and a class directed towards domestic violence. Mother attended church services while she was in the MonDay program and worked as a cook while incarcerated in the county jail.

{¶25} Mother asserted that she had stable income in compliance with the case plan. Mother indicated she began working at Frisch's three weeks before the hearing and made $10.25 per hour. At the time of hearing, Mother was working part time but believed her hours would increase to 40 hours per week in the near future. Mother conceded that most of her paycheck went to her child support payment; however, she planned to find a higher paying job in the future.

{¶26} Mother admitted she did not have housing at the time of the hearing, but was living rent-free with her aunt. According to Mother, she had looked into low-income housing options and planned to save money in order to obtain housing. Mother expressed concern with renting a three-bedroom apartment large enough for herself and the children prior to officially receiving custody of the children. Mother described some challenges she faced with obtaining suitable housing. Specifically, Mother testified she had been evicted on two prior occasions, one of which was from public housing, and that she was ineligible to rent certain properties due to her felony convictions. Despite these challenges, Mother indicated she had found an apartment for $360 per month.

{¶27} Mother acknowledged that she did not have a driver's license at the time of the hearing, but indicated she was saving money to pay the $650 reinstatement fee. According to Mother, she would have enough to pay the reinstatement fee in two weeks. Mother testified that in the months following the reinstatement of her license, she would obtain car insurance, retrieve her car from Grandmother, and get a new job making more

money in order to obtain suitable housing. At the time of the hearing, Mother testified she had saved $500, which she planned to use to get her driver's license reinstated.

{¶28} With regard to her substance abuse problem, Mother detailed her various drug convictions including a conviction for trafficking cocaine, aggravated trafficking of fentanyl, and attempting to tamper with evidence.[3] Mother admitted that she was in the midst of drug treatment when she was arrested on one of the drug charges. Despite testing positive for cocaine, heroin, marijuana, and methamphetamine on several occasions, Mother testified she had used marijuana on one occasion, but did not use the remaining illegal substances. Rather, Mother explained that her positive tests were a result of handling and selling the drugs, not from her active use. According to Mother, her ex-fiancé, who she was in a relationship with for six years, sold drugs "all the time," and she helped him sell drugs when he asked her. Mother testified that although she was diagnosed with a cocaine dependency, she did not use cocaine. Mother claimed she told the drug treatment facility she used cocaine in order to receive treatment and get her children back.

{¶29} Mother testified she had complied with her objectives and treatment goals since her release from the MonDay program in December 2019. Mother further testified that she is on probation for five years as a result of her criminal charges, and is drug tested once a week as a part of her aftercare, and every two weeks as a result of her probation.

{¶30} Mother believes she should be able to raise her children and provide for their needs. Mother indicated she knows she can do it, she just needs a "little bit more time to get a place, to show everybody that [she] can do it[.]" If her children could not be with her, Mother would prefer them to be with their current foster parents. Mother recognized that

---

3. Mother was also convicted of an unrelated charge of theft due to an incident where welfare "overpaid" Mother in food stamps.

the foster parents do a great job taking care of the children and the children are safe, loved, and protected in their current foster home.

**The Juvenile Court's Decision**

{¶31} Following the hearing, the magistrate granted CCDJFS's motions for permanent custody. Mother objected to the magistrate's decision. After its review of the evidence and the case file, the juvenile court issued a decision overruling Mother's objections and granting CCDJFS's motions for permanent custody. In so holding, the juvenile court determined that K.G., J.G., and M.G. had been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period and that CCDJFS had proved by clear and convincing evidence that a grant of permanent custody was in the children's best interests.

{¶32} Mother now appeals from the juvenile court's decision granting CCDJFS's motions for permanent custody. In support, Mother raises a single assignment of error arguing the juvenile court's decision to grant permanent custody was not supported by sufficient evidence and was against the manifest weight of the evidence.

**Standard of Review**

{¶33} Before a natural parent's constitutionally protected liberty interest in the care and custody of his or her child may be terminated, the state is required to prove by clear and convincing evidence that the statutory standards for permanent custody have been met. *In re K.W.*, 12th Dist. Butler No. CA2015-06-124, 2015-Ohio-4315, ¶ 11, citing *Santosky v. Kramer*, 455 U.S. 745, 759, 102 S.Ct. 1388 (1982). An appellate court's review of a juvenile court's decision granting permanent custody is generally limited to considering whether sufficient credible evidence exists to support the juvenile court's determination. *In re M.B.*, 12th Dist. Butler Nos. CA2014-06-130 and CA2014-06-131, 2014-Ohio-5009, ¶ 6.

This court will therefore reverse a juvenile court's decision to grant permanent custody only if there is a sufficient conflict in the evidence presented. *In re K.A.*, 12th Dist. Butler No. CA2016-07-140, 2016-Ohio-7911, ¶ 10. However, even if the juvenile court's decision is supported by sufficient evidence, "an appellate court may nevertheless conclude that the judgment is against the manifest weight of the evidence." *In re T.P.*, 12th Dist. Butler No. CA2015-08-164, 2016-Ohio-72, ¶ 19.

{¶34} As with all challenges to the manifest weight of the evidence, in determining whether a juvenile court's decision is against the manifest weight of the evidence in a permanent custody case, an appellate court "'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered.'" *In re S.M.*, 12th Dist. Case Nos. CA2018-08-088 thru CA2018-08-091 and CA2018-08-095 thru CA2018-08-097, 2019-Ohio-198, ¶ 16, quoting *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20. The presumption in weighing the evidence is in favor of the finder of fact, which we are especially mindful of in custody cases. *In re C.Y.*, 12th Dist. Butler Nos. CA2014-11-231 and CA2014-11-236 thru CA2014-11-238, 2015-Ohio-1343, ¶ 25. Therefore, "[i]f the evidence is susceptible to more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment." *Eastley* at ¶ 21.

### Two-Part Permanent Custody Test

{¶35} Pursuant to R.C. 2151.414(B)(1), the juvenile court may terminate parental rights and award permanent custody of a child to a children services agency if the court makes findings pursuant to a two-part test. *In re G.F.*, 12th Dist. Butler No. CA2013-12-

248, 2014-Ohio-2580, ¶ 9. First, the juvenile court must find that the grant of permanent custody to the agency is in the best interest of the child, utilizing, in part, the factors of R.C. 2151.414(D). *In re D.K.W.*, 12th Dist. Clinton No. CA2014-02-001, 2014-Ohio-2896, ¶ 21. Second, pursuant to R.C. 2151.414(B)(1)(a) to (e), the juvenile court must find that any of the following apply: (1) the child is abandoned; (2) the child is orphaned; (3) the child has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period; (4) where the preceding three factors do not apply, the child cannot be placed with either parent within a reasonable time or should not be placed with either parent; or (5) the child or another child in the custody of the parent from whose custody the child has been removed, has been adjudicated an abused, neglected, or dependent child on three separate occasions. *In re C.B.*, 12th Dist. Clermont No. CA2015-04-033, 2015-Ohio-3709, ¶ 10. Only one of these findings must be met to satisfy the second prong of the two-part permanent custody test. *In re A.W.*, 12th Dist. Fayette No. CA2014-03-005, 2014-Ohio-3188, ¶ 12.

### The Juvenile Court's Analysis

{¶36} As it relates to the second part of the two-part permanent custody test, the juvenile court found K.G., J.G., and M.G. had been in the temporary custody of CCDJFS for more than 12 months of a consecutive 22-month period as of the November 4, 2019 motion for permanent custody. This finding is not disputed by Mother and is supported by the record, as the children have been in the temporary custody of the agency since April 2018. Instead, Mother disputes that granting permanent custody of the children to the agency was in K.G.'s, J.G.'s, and M.G.'s best interests. We find no merit to Mother's claims.

{¶37} When considering the best interest of a child in a permanent custody hearing, the juvenile court is required under R.C. 2151.414(D)(1) to consider all relevant factors,

- 12 -

including, but not limited to (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-town providers, and any other person who may significantly affect the child; (2) the wishes of the child, as expressed directly by the child or through the child's guardian ad litem; (3) the custodial history of the child; (4) the child's need for a legally secured permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any of the factors listed in R.C. 2151.414(E)(7) to (11) apply in relation to the parents and child.

{¶38} Initially, with respect to the children's relevant interactions and relationships with those who may significantly impact their young lives, the juvenile court discussed the children's relationships with each other, Mother, Father, Grandmother, and their foster parents. The juvenile court found that although Father initially visited with the children, he had only visited the children once since December 2018. The juvenile court further found that although Grandmother was the custodian of the children when the agency was granted custody, and had visited with the children prior to her incarceration, she was currently serving two and one-half years in prison.

{¶39} With regard to the children's relationships with Mother, the juvenile court found that Mother visited with the children on a regular basis when she had the ability to do so. This included visiting with the children after she entered the MonDay program in August 2019. The juvenile court noted that Mother clearly loves her children.

{¶40} Continuing with this factor, the juvenile court found the children had been in their foster parents' home since April 2018 and had been given the opportunity to participate in sporting activities in their free time. The juvenile court indicated the children enjoy spending time outdoors with their foster family and socializing with their foster parents'

extended families. The juvenile court further noted the foster parents feel bonded to the children and love them, and have ensured the children receive the mental health treatment they need for future development.

{¶41} Next, regarding the children's wishes, the juvenile court relied upon the guardian ad litem's report and recommendation that permanent custody of the children should be granted to CCDJFS. In her report, the guardian ad litem noted that the children stated they hoped to reunify with Mother, but are "fine with being adopted by the foster family."

{¶42} With regard to the children's custodial histories, the juvenile court reiterated that the children had been in the temporary custody of CCDJFS for a period in excess of 12 months out of a consecutive 22-month period. The juvenile court further noted that prior to the agency's temporary custody of the children, the children were in the legal custody of Grandmother.[4]

{¶43} When considering the children's need for a legally secure placement, the juvenile court found that neither Mother, Father, nor Grandmother are suitable to provide care for the children. With regard to Father, the juvenile court found that he cannot meet the needs of the children and provide them with a stable and consistent environment given his lack of visitation and inability to complete any portion of his case plan. The juvenile court also found Grandmother was unsuitable to provide care for the children and she could not provide a home while serving her sentence in prison.

{¶44} The juvenile court credited Mother for completing a portion of her case plan,

_____

4. Once again, there is no indication that Grandmother had ever been granted legal custody of the children. We construe this finding of the juvenile court as the use of imprecise language to convey that the children were living with and primarily cared for by Grandmother as of the time the children were placed in the temporary custody of CCDJFS.

- 14 -

but noted remaining concerns regarding Mother's continued trafficking of drugs, her inability to make good decisions and prioritize the welfare of her children, and her failure to accept responsibility for her actions. The juvenile court expressed its continuing concerns that Mother's part-time job at Frisch's did not produce sufficient income to support the children and obtain housing, and about the challenge she faced in having her driving privileges restored, her historical inability to maintain stability and her lack of motivation to change.

{¶45} In contrast, the juvenile court found the foster parents have consistently provided a stable home environment for the children since 2018. The juvenile court noted the foster parents' efforts to provide consistency for the children, including encouraging contact between the children and Mother. The juvenile court reiterated that the foster parents have the ability to meet the children's needs, including their mental health needs, and provide them greater opportunities for social and physical development through extracurricular activities. In concluding with this factor, the juvenile court found that by granting permanent custody of the children to the agency, the agency will be able to arrange an adoption with willing parents, like the foster parents, who can provide a legally secure permanent placement for the children.

{¶46} With regard to R.C. 2151.414(D)(1)(e), the juvenile court determined that Father has abandoned the children, as he has failed to visit or maintain contact with the children for a period in excess of 90 days.

{¶47} Based on these findings, the juvenile court found by clear and convincing evidence that it was in K.G.'s, J.G.'s, and M.G.'s best interests to grant permanent custody to CCDJFS.

**The Appeal**

{¶48} Mother argues the juvenile court erred in various respects in granting the

motion for permanent custody.

{¶49} Mother first argues the juvenile court erred by minimizing the weight to be given to the children's bond with her and the effort she made to remain engaged in their lives. As noted above, there is not one element that is given greater weight or heightened significance than others. *In re C.F.,* 113 Ohio St. 3d 73, 2007-Ohio-1104. The bond between Mother and the children is only one of the factors the juvenile court must take into consideration when making its best interest determination.

{¶50} Further, the record reflects the juvenile court expressly considered Mother's love for and bond with the children, as well as her consistent visitation with the children when possible. However, despite Mother's unquestionable love for her children, and the children's desire to reunify with Mother, the juvenile court determined permanent custody to the agency was in the children's best interest. Such a decision is supported by the record where, as discussed at length below, there are serious concerns regarding Mother's ability to provide a stable and secure home for the children. *See In re K.F.,* 12th Dist. Butler No. CA2011-12-233, 2012-Ohio-2958, ¶ 39, 51-52 (finding the grant of permanent custody of the parents' children was in the children's best interests despite evidence the parents maintained consistent visitation with the children and the children and parents were bonded).

{¶51} We further note that, although the record indicates Mother engaged in consistent visitation with the children throughout this case, such visitation would not have occurred without the foster parents' desire to maintain consistency in the children's lives, as well as their recognition of the children's bond with their Mother. The foster parents were not required to facilitate visitation during Mother's enrollment at the MonDay program, however, the foster parents elected to do so for the sake of the children.

{¶52} On appeal, Mother ignores the bond that has developed between the children and their foster parents since 2018. The guardian ad litem reported the children were "fine" with being adopted by their foster parents and are bonded with them. Foster Father testified that he and his wife love the children and the children love them as well. Since entering the foster home, the children are physically, educationally, and emotionally thriving, and enjoy engaging in family activities with their foster family. The record indicates the foster parents are meeting the children's needs and intend to adopt the children if permanent custody is granted to CCDJFS. While the foster parents are not currently licensed to do so, Foster Father indicated they could become licensed, and the "hope" is that the children can be permanently placed in their current foster home.

{¶53} We also reject Mother's argument that she can provide a legally secure placement for the children. While Mother has completed several of the requirements of her case plan, it is well settled that successful completion of one's case plan is not dispositive of the issue of reunification. *In re E.B.,* 12th Dist. Warren Nos. CA2009-10-139 and CA2009-11-146, 2010-Ohio-1122, ¶ 30 ("it is well-settled that the completion of case plan services alone does not equate to or necessitate a finding that the parents have substantially remedied the conditions that caused the removal of the child from the home"). Notably, "the key concern is not whether the parent has successfully completed the case plan, but whether the parent has substantially remedied the concerns that caused the child's removal from the parent's custody." *In re S.M.,* 12th Dist. Clermont No. CA2015-01-003, 2015-Ohio-2318, ¶ 24. Thus, the case plan is a means to the goal of reunification, but not the goal itself. *In re V.N.,* 12th Dist. Butler Nos. CA2016-12-229, CA2016-12-230, CA2016-12-235, and CA2016-12-236, 2017-Ohio-2586, ¶ 34.

{¶54} Notwithstanding Mother's near completion of her case plan, the record reflects

Mother failed to address the agency's ongoing concerns related to her stability. At the time of the hearing, Mother did not have housing that could accommodate the children, nor could she afford to immediately acquire housing if the children were placed in her care. While Mother contends she has the means to financially support her children, the record reflects Mother had only been employed for approximately three weeks, and did not have much disposable income after paying her child support obligation. Although Mother indicated she investigated low-income housing options, and had located an apartment large enough for her and the children for $360 per month, Mother did not state when she could afford to rent such an apartment or when a low-income housing option would become available. We find this concerning, as Mother was working and living rent free at the time of the hearing but remained unable to afford suitable housing and the reinstatement of her license before the hearing occurred. This is likely due to Mother only working part time and paying a significant amount of her income towards her child support obligation. While Mother claimed she intended to obtain a higher paying job after reinstating her license, as well as her intention to start working 40 hours per week in the near future, Mother did not produce any evidence to support those assertions.

{¶55} Mother argues her failure to relocate by the time of trial does not equate to an inability to secure suitable housing for the children. Mother claims she has several resources available to her and could have arranged "for alternative housing for the children with appropriate family or friends, with her in a hotel, or in the worst case [sic] scenario with her in a shelter." This contention highlights the uncertainty regarding Mother's ability to find stable and secure housing for herself and the children, and the instability with Mother's living situation at the time of the permanent custody hearing.

{¶56} Moreover, even if it is possible that Mother could quickly obtain suitable

housing suitable for the children, there is no evidence Mother can maintain such housing. Rather, the record indicates Mother has not enjoyed stable housing throughout the pendency of this case, as she was incarcerated for a period of time, was evicted from at least one apartment, lived with Grandmother for a short period of time, and has since been living with her aunt, who will not accept the children into her home. Furthermore, part of the agency's concerns regarding Mother's housing relates to her inability to keep inappropriate individuals out of the home and away from the children. Because Mother has been unable to obtain any housing for herself and the children throughout the 21-month pendency of this case, there is no suggestion in the record that Mother can do so now.

{¶57} Given Mother's history, it is reasonable to conclude that Mother would be unlikely to provide the children with a permanent and stable home. Thus, accepting Mother's claim that she would be able to obtain housing if the children were placed in her care ignores experience. As this court has stated, "[a] child's life is not an experiment that can be left to chance." *In re. G.W.*, 12th Dist. Butler No. CA2019-01-003, 2019-Ohio-1586, ¶ 52. "'The law does not require the court to experiment with a child's welfare to see if the child will suffer great detriment or harm.'" (Internal brackets omitted.) *In re B.C.*, 12th Dist. Warren Nos. CA2018-03-024 and CA2018-03-027, 2018-Ohio-2673, ¶ 30, quoting *In re R.S.-G.*, 4th Dist. Athens No. 15CA2, 2015-Ohio-4245, ¶ 53. "[C]hild[ren] should not have to endure the inevitable to its great detriment and harm in order to give the * * * parent an opportunity to prove [their] suitability." *In re P.S.*, 5th Dist. Licking No. 16-CA-11, 2016-Ohio-3489, ¶ 51.

{¶58} Moreover, the record reflects Mother refuses to acknowledge her own faults or take responsibility for her own actions, especially the actions related to her substance abuse. Despite acknowledging that she tested positive for several illegal substances

throughout the case, Mother continues to deny using any illegal substances aside from marijuana. Instead, Mother claims her positive results were a result of handling the substances, not using them. Mother denies she has a cocaine dependency, and testified she only admitted to such a dependency in order to receive custody of her children. Mother minimizes her involvement in her ex-fiancé's long-term drug trafficking business, which resulted in a felony conviction for Mother. We further note that Mother failed her first substance treatment program due to her continued trafficking of drugs. Thus, although Mother ultimately completed drug treatment, her continued denial of any substance abuse issue, in addition to her continued drug trafficking while engaging in prior treatment, does not portend well for Mother's continued sobriety.

{¶59} While Mother requested "a little bit more time" to prove her stability and obtain suitable housing, a parent "'is afforded a reasonable, not an indefinite, period of time to remedy the conditions causing the children's removal.'" *In re A.M.L.*, 12th Dist. Butler No. CA2013-01-010, 2013-Ohio-2277, ¶ 32, quoting *In re L.M.*, 11th Dist. Ashtabula No. 2010-A-0058, 2011-Ohio-1585, ¶ 50. The agency has been involved with the children since 2016. Thus, at the time of the permanent custody motion, Mother had been given approximately three years to remedy the agency's concerns. Mother has failed to demonstrate she can provide a safe and stable environment for K.G., J.G., and M.G. It is not in the children's best interest to gamble on the possibility that Mother may be able to obtain stability in the future. This is especially true where the children are now thriving in a stable and secure environment with their foster parents. As a result, Mother's request for more time is simply too late.

## Conclusion

{¶60} The juvenile court did not err in granting CCDJFS's motions for permanent

- 20 -

custody. The juvenile court's decision to grant permanent custody was supported by clear and convincing evidence and was otherwise not against the manifest weight of the evidence. The juvenile court, just like this court, must act in a manner that places K.G.'s, J.G.'s and M.G.'s best interests above all else. "'[Children's] best interests are served by the [children] being placed in a permanent situation that fosters growth, stability, and security.'" *In re D.E.*, 12th Dist. Warren Nos. CA2018-03-035 and CA2018-04-038, 2018-Ohio-3341, ¶ 60, quoting *In re Keaton*, 4th Dist. Ross Nos. 04CA2785 and 04CA2788, 2004-Ohio-6210, ¶ 61. The children need permanency and cannot and should not wait until Mother is able to resolve her issues. A grant of permanent custody to the agency, where K.G., J.G., and M.G. can be adopted by a family that can provide for their needs, is the only solution. Therefore, finding no merit to any of the arguments raised herein by Mother, Mother's assignment of error is overruled and the juvenile court's permanent custody determination is affirmed.

{¶61} Judgment affirmed.

PIPER, P.J., and HENDRICKSON, J., concur.